**UNITED STATES of America,
Plaintiff-Appellee,**

v.

**Roy DORN, Andy Smith, and Charles
Mancor, Defendants-Appellants.**

Nos. 76–1908 to 76–1910.

United States Court of Appeals,
Seventh Circuit.

Argued May 26, 1977.

Decided Aug. 31, 1977.

Dennis P. Coffey, William M. Coffey, James R. O'Brien, D. Michael Guerin, Milwaukee, Wis., for defendants-appellants.

William J. Mulligan, U. S. Atty., David B. Bukey, Asst. U. S. Atty., Milwaukee, Wis., for plaintiff-appellee.

Before CLARK, Associate Justice,* and CUMMINGS and SPRECHER, Circuit Judges.

PER CURIAM.

After trial on Count I of a ten-count indictment,[1] the three appellants were convicted by a jury in the district court of a conspiracy to import heroin, to distribute and possess (with intent to distribute) heroin, to use communication facilities to facilitate the importation and distribution of heroin, and to travel and use facilities in foreign commerce with intent to distribute the proceeds of a business enterprise involving heroin, all in violation of 21 U.S.C. §§ 846 and 963. Dorn was sentenced to a term of imprisonment of fourteen years, Smith was sentenced to a term of ten years, and Mancor was sentenced to a term of three years.

I

Appellants, along with Albert and Gudrun Herrmann,[2] organized a drug ring operating between Vancouver, British Columbia in Canada and Milwaukee, Wisconsin. In June of 1972, Albert, experiencing troubles with U.S. Immigration authorities, went to Vancouver to visit his friend George W. Turner. During his visit to Vancouver, he was introduced to Dorn. Albert discussed with Dorn the possibility of his working for Dorn, reselling heroin in the Milwaukee area. It was agreed that Dorn would sell Albert 35 ounces of 50% pure heroin for $2,000 per ounce plus $1,000 fee for delivery in Milwaukee. The agreement called for each ounce of heroin to be buried in advance by one of Dorn's couriers at specific locations in Milwaukee. Upon payment to Dorn, Albert would be supplied with a slip of paper bearing a codified address of the burial locations. Also during his trip to Vancouver, Albert met appellants Smith and Mancor, introduced to him by either Dorn or Turner. Albert returned to Milwaukee where on June 19, 1972, he called Dorn in Vancouver. One day later Dorn arrived in Milwaukee. Also arriving in Milwaukee then (but taking separate transportation) was Smith. All three met to discuss the sale of heroin. At this meeting Dorn asked Smith in Albert's presence if he had finished burying the heroin, and then instructed Albert to buy some small jars, some lactose, a scale, and masking tape. Dorn also gave Albert an ounce of heroin on credit. Dorn and Smith traveled to Milwaukee three other times during the summer and early fall of 1972 to bury heroin and to meet with Albert.

During the early fall, Albert became dissatisfied with the arrangement with Dorn and Smith, and later with Mancor. In September, Mancor arrived in Milwaukee as Smith's assistant. In early October Albert went to Montreal to discuss alternative sources of heroin with his friend Turner. While in Montreal, Albert obtained two ounces of heroin from Turner and Turner's associate Raymond Shepherd. The two also told Albert that they would be receiving greater supplies of heroin and would be willing to sell him up to $30,000 worth of heroin. Albert traveled to Montreal a second time in late November to complete plans with Turner and Shepherd but ultimately was unable to carry through with his design for further heroin purchases from them. This was due to a delay in the receipt of the large shipment of heroin, coupled with rumors of Shepherd's arrest. Therefore Albert continued his association with Dorn, receiving addresses from him,

---

* Honorable Tom C. Clark, Associate Justice of the Supreme Court, Retired, heard oral argument and participated in the disposition conference. However, his death occurred before this opinion was prepared.

1. The other nine courts were dropped before the appellants were extradited from Canada, because of certain terminology in our extradition treaty with Canada.

2. Albert and Gudrun Herrmann were divorced before this case was brought to trial. Gudrun resumed the use of her maiden name and testified at this trial under the name of Gudrun Will. Because she and Albert Herrmann married during the term of the conspiracy, they will be addressed as a married couple in this opinion, but their first names will be employed to differentiate them.

sending him money from time to time, and ordering more heroin.

In December a new method of delivery was employed to cut delivery costs. Instead of making delivery in Milwaukee, delivery was to made on the west coast. Accordingly, on December 8, Gudrun flew to Seattle, Washington, where she met Dorn and Mancor and took receipt of three condoms containing heroin. For this heroin, Dorn received $5,000 from Gudrun. Gudrun then flew back to Milwaukee and gave the heroin to her husband. On December 28, Albert flew to Vancouver and bought two more ounces of heroin from Dorn for $4,800. Soon thereafter, Albert had a falling out with Dorn over a $500 delivery fee and as a result began to look elsewhere for other sources of heroin.[3]

In the spring of 1973, Albert began buying heroin from one William Peters in Vancouver. One of Albert's regular customers at this time was Special Agent Lee who in late April proposed to Albert a large purchase involving a kilogram or more of heroin. In an effort to accommodate this order from Lee, Albert contacted several of his sources of supply, one of whom was Dorn. Albert inquired of Dorn about the availability of a large amount of heroin in Vancouver. Dorn advised him that the situation was unsafe but agreed to see if anything would be available. On May 2, Albert called Dorn who informed Albert that heroin was available at $2,400 per ounce. Later in May, Albert went to Vancouver where, among other people, he met again with Dorn and discussed the availability of heroin for purchase. However, the proposed deal never materialized and within a month Albert was arrested by the authorities in Milwaukee.

At trial the Government's case relied principally upon the testimony of Albert and his ex-wife Gudrun, substantial documentary corroboration of Albert's and Dorn's activities,[4] and tapes of telephone conversations between Dorn and Albert in April, 1973. Six issues are raised on this appeal:

(1) Whether the trial court properly admitted evidence of conspiratorial activity alleged as overt acts in the indictment but which had occurred approximately three months following an alleged termination of the conspiracy by the Government's principal witness?

(2) Whether the trial court properly admitted under Rule 801(d)(2)(E), Federal Rules of Evidence, statements made by a conspirator to his co-conspirator wife which described the framework of a newly formed criminal enterprise then involving Dorn and Smith?

(3) Whether the use of transcripts of certain tape-recorded telephone conversations given to the jury at trial and during its deliberations for their assistance was permissible?

(4) Whether the trial court abused its discretion in denying a motion for mistrial based upon a government witness' single reference to an apparent previous incarceration of an appellant?

(5) Whether sufficient evidence was presented to support Mancor's conviction of conspiracy to violate the controlled substance laws?

(6) Whether reversible error was committed by the trial court in permitting the principal government witness to describe certain collateral activities not related to the three appellants?

---

**3.** Albert's animosity was compounded when Dorn issued an alleged telephonic death threat to Albert's wife, while he was away from Milwaukee. At this point, as the record indicates, Albert wished to cease doing business with Dorn; however, nothing in the record indicates that Dorn himself desired to terminate the relationship.

**4.** Substantial documentary corroboration was introduced into evidence by the Government to account for and establish the movements of the members of this conspiracy and to corroborate and buttress the testimony given by Albert and Gudrun Herrmann, such as telephone tolls, hotel registrations, airline tickets, police reports, postal registry receipts, Western Union moneygrams, etc.

## II

■ Appellants argue that the district court erred in allowing evidence of further conspiratorial activity after January 1973 on the ground that Albert terminated his participation in the conspiracy at that time. Specifically, the appellants point to Albert's testimony where he stated that (1) in January 1973 he avoided the appellants as much as possible because he did not want to have more heroin dealings with them and (2) later that month he told Dorn that he was not going to have further dealings with him. We disagree. Albert's remarks, coupled with his supposed lack of contact with any of the appellants for a period of three months in the winter and early spring of 1973, do not constitute the kind of strong evidence sufficient to meet the appropriate "rigorous requirements for making out a defense of withdrawal from a conspiracy * * *." *United States v. Borelli,* 336 F.2d 376, 388 (2d Cir. 1964), certiorari denied 379 U.S. 960, 85 S.Ct. 647, 13 L.Ed.2d 555. As is well settled, this burden of establishing withdrawal lies on the defendant and, in order for such a defense to prevail, a defendant must demonstrate some type of affirmative action which disavows or defeats the purpose of the conspiracy, either by "making of a clean breast to the authorities, or communication of the abandonment in a manner reasonably calculated to reach co-conspirators." *United States v. Borelli, supra; United States v. Hyde,* 225 U.S. 347, 32 S.Ct. 793, 56 L.Ed. 1114. Moreover, this Court has held in *United States v. Nowak,* 448 F.2d 134, 139 (7 Cir. 1971) that a withdrawal defense requires that the abandonment be complete and in good faith.[5] Viewing the evidence in a light most favorable to the Government (*Glasser v. United States,* 315 U.S. 60, 62 S.Ct. 457, 86 L.Ed. 680), the record discloses that during the period in question Albert was able to secure heroin from a number of different sources. Merely because his use of the Dorn avenue was inactive for a three month period does not mean the criminal agreement had terminated. Also there is no evidence to suggest that Dorn or the other co-conspirators had affirmatively withdrawn. In fact, Albert contacted Dorn in April 1973 concerning the procurement of heroin and Dorn was quite willing to resume whﾟre they had last left off. Since the jury was carefully instructed on this point and there was substantial evidence to support their finding that the conspiracy continued after January of 1973, the district court did not err in this respect.

■ Dorn complains that Gudrun was improperly permitted to testify to certain statements made to her husband in the summer of 1972 which are claimed not to have been in furtherance of the conspiracy, as required by Rule 801(d)(2)(E), Federal Rules of Evidence. The purpose of the Rule is "to protect the accused against idle chatter of criminal partners as well as inadvertently misreported and deliberately fabricated evidence." Weinstein on Evidence, ¶ 801(d)(2)(E)[01], pp. 801–845. The alleged hearsay comments at issue all occurred shortly after Albert's return from Vancouver in June 1972. They essentially involved Albert's telling his wife what was going on and who had been assigned roles in the scheme, with the idea of enlisting his wife in the criminal enterprise.[6] Conversations made by conspirators to prospective co-con-

---

**5.** See also *United States v. Hickey,* 360 F.2d 127 (7th Cir. 1966); *United States v. Bastone,* 526 F.2d 971 (7th Cir. 1975); *United States v. Abraham,* 541 F.2d 1234 (7th Cir. 1976); *United States v. Harris,* 542 F.2d 1283 (7th Cir. 1976).

**6.** Within a matter of days and certainly no later than one month from the time of these conversations with Albert, Gudrun was acting as a co-conspirator. As early as June 20, 1972, she spoke directly with Dorn, Smith and her husband at the Riverboat Lounge in Milwaukee where heroin trafficking was discussed. (T. 319–320) Within a short time, she drove Smith around town so that he could bury heroin. On five or six separate occasions that summer, she assisted Albert in digging up heroin in Milwaukee. On July 25, 1972, she spoke with Dorn by phone in Vancouver and sent him a moneygram to British Columbia to pay for a heroin packet. She could not have been enlisted by Albert to do these things without knowing at least minimally what each conspirator's duties were.

spirators for membership purposes are acts in furtherance of the conspiracy (*United States v. Halpin,* 374 F.2d 493, 495 (7th Cir. 1967); *United States v. Nardone,* 106 F.2d 41, 43 (2d Cir. 1939), reversed on other grounds, 308 U.S. 338, 60 S.Ct. 266, 84 L.Ed. 307) so that this evidence was properly admitted.

Appellants argue that the transcripts of the tapes of two telephone conversations between Dorn and Albert should not have been allowed into the jury room during the jury's deliberations because the transcripts were never admitted into evidence and because the transcripts contained blatant inaccuracies. Before any tapes were played before the jury, the court conducted a hearing outside of their presence. At that time Albert identified the parties to the calls as being himself and Dorn. The tapes were then played while the Court and counsel followed along with the assistance of the transcripts. Appellants Mancor and Dorn objected to the use of the transcripts by the jury on the basis of certain supposed discrepancies or inaccuracies existing between the tapes and the transcripts. The court ruled that the transcripts were sufficiently accurate to be read by the jury. The jury returned and the court gave a cautionary instruction that the transcripts were for the purpose of assisting them to better understand the conversations recorded on the tapes and if they found any conflict between the tapes and the transcripts the tapes were to control. The jury then listened to the tapes. When the tapes, along with the transcripts, were sent to the jury room, a similar instruction was given by the court. The procedure employed by the district court of permitting the jury to utilize transcripts not admitted into evidence in order to assist them in understanding tape-recorded conversations, is well known and has been consistently approved. See *Fountain v. United States,* 384 F.2d 624 (5th Cir. 1967), certiorari denied sub nom.; *Marshal v. United States,* 390 U.S. 1005, 88 S.Ct. 1246, 20 L.Ed.2d 105; *United States v. McMillan,* 508 F.2d 101 (8th Cir. 1974); *United States v. Carson,* 464 F.2d 424 (2d Cir. 1972); *United States*

*v. Koska,* 443 F.2d 1167 (2d Cir. 1971). The claim of error concerning the inaccuracies purportedly existing between the tapes and the transcripts is without merit. The discrepancies complained of were so minimal that they could not have substantially affected the meaning of the conversations. Moreover, any problems that could have arisen were obviated by the meticulous instructions given the jury concerning the proper function of the transcripts.

During the direct examination of Albert by the Government, Albert indirectly referred to Smith's prior incarceration. Because of the strong likelihood of prejudice, Smith and Dorn contend that a mistrial should have been granted. We cannot agree. The statement complained of was totally inadvertent, constituted a completely non-responsive answer to a proper question, was clearly unforeseeable, and occurred as an isolated incident in the early stages of a week-long trial. Under such circumstances we cannot view the denial of the motions for mistrial by the district court as an abuse of its discretion. See *White v. United States,* 279 F.2d 740, 749 (4th Cir. 1960); *Hardy v. United States,* 119 U.S.App.D.C. 364, 343 F.2d 233, 234 (1964); *United States v. Bynum,* 485 F.2d 490, 503 (2d Cir. 1973); *United States v. Stromberg,* 268 F.2d 256 (2d Cir. 1959), certiorari denied sub nom.; *Lessa v. United States,* 361 U.S. 863, 80 S.Ct. 119, 4 L.Ed.2d 102; *United States v. Andrea,* 538 F.2d 1255, 1256 (6th Cir. 1976).

The remaining issues are equally without merit and can be easily resolved. Mancor contends that the evidence presented against him was insufficient to support a guilty verdict. The record, when viewed in a light most favorable to the Government with all reasonable inferences to be drawn therefrom (*Glasser v. United States, supra* ), indicates that there was ample evidence to support the verdict of guilty. Furthermore, it is the function of the jury and not a reviewing court to resolve conflicting evidence and testimony and to judge the credibility of witnesses. *United States v.*

*Turner,* 423 F.2d 481, 484 (7th Cir. 1970). Finally, Smith and Mancor contend that the district court erred in allowing into evidence Albert's testimony concerning his purchases of heroin from Turner and Shepherd in Montreal and from Peters in Vancouver, as well as Agent Lee's testimony regarding purchases of heroin from Albert in the spring of 1972. But it is well settled that evidence of other crimes may be presented when they are so blended or connected with the one on trial that proof of one incidently involves the other or explains the circumstances thereof or tends logically to prove any element of the crime charged. *United States v. Turner, supra,* at 483–484; see also Rule 403 of the Federal Rules of Evidence.

For the foregoing reasons, the judgments of conviction are affirmed.