**UNITED STATES of America,
Plaintiff-Appellee,**

v.

**Juan Carlos PUERTA RESTREPO,
Defendant-Appellant.**

**No. 86–1809.**

United States Court of Appeals,
Seventh Circuit.

Argued Oct. 27, 1986.

Decided March 25, 1987.

Rehearing and Rehearing En Banc
Denied May 15, 1987.

Jon May, Miami, Fla., for defendant-appellant.

Eric J. Klumb, Asst. U.S. Atty., Joseph P. Studmueller, U.S. Atty., U.S. Atty's. Office, Milwaukee, Wis., for plaintiff-appellee.

Before CUMMINGS and CUDAHY, Circuit Judges, and WILL, Senior District Judge.*

WILL, Senior District Judge.

### STATEMENT OF THE CASE

After a jury trial, the defendant was found guilty of conspiracy to possess with intent to distribute some seven kilograms of cocaine (Count I) in violation of 21 U.S.C. § 846, engaging in interstate travel to promote a business enterprise involving controlled substances (Count II) in violation of 18 U.S.C. § 1952(a)(3), and possession with intent to distribute cocaine (Count III) in violation of 21 U.S.C. § 841(a)(1) and 18 U.S.C. § 2 and sentenced to ten years on Count I, five years on Count II and ten years on Count III all to run concurrently. We affirm.

### THE FACTS

On September 27, 1985, James Brill was arrested as a result of information obtained from one Russell Buckner who had been arrested in May 1985 while attempting to deliver a quarter pound of cocaine. Between November 1984 and his arrest, Buckner, who had previously known Brill in prison, had been a "driver" for Brill and testified that he had transported cash or cocaine for him frequently with Brill present, on ten separate occasions. His trips had taken him from Oshkosh, Wisconsin, the center of Brill's activities, to Milwaukee and Madison, Wisconsin, the greater Chicago area and as far as California. At various times he delivered $250,000 to Chicago for Brill, picked up 13 kilograms of cocaine in Chicago and delivered it to Oshkosh, delivered five kilograms to California, picked up 17 kilograms in Milwaukee and delivered it to Oshkosh, delivered $525,000 to Chicago, collected $90,000 in Madison and delivered it to Oshkosh, delivered three kilograms to California, picked up 20 kilograms in Chicago and took them to Oshkosh and again carried $525,000 to Chicago. All of these payments were for cocaine provided to Brill by a man known to Buckner only as "Leon."

After his arrest but on the same day, a search of Brill's residence produced, among other items, $144,200 in cash. Brill had obviously been a substantial cocaine trafficker. Shortly after his arrest, Brill agreed to cooperate with federal drug enforcement agents and between October 31 and November 8, 1985, participated in nine recorded telephone conversations, the first seven of which were between Brill in Wisconsin and either the appellant or his brother, Armando Leon Puerta Restrepo ("Leon") in Florida and the last two of which were between Brill and the appellant in Milwaukee.

In his guarded conversations with Leon, it is clear that Brill was asking for ten kilograms of cocaine and Leon was offering only seven. Brill offered to pay $33,000 per kilo, Leon was asking $34,000. Brill agreed to pay Leon his past indebtedness for earlier cocaine deliveries as well as for the new delivery. They agreed to negotiate later the price for the new delivery.

On November 6, 1985, at about 5:45 p.m., Brill returned a call to a Florida number which had been left on his pager. A man answered and when Brill asked "Hello, Leon," said "Yeah, this is his brother, Juan." There followed a conversation in which the man identifying himself as Juan talked about the two of them having met "months ago" "with Mike" "at the hotel one day" "downstairs at the airport." He explained that "this person's leaving in the morning" because "we had a little problem" "finding something just the way you like it." Brill objected to the delay and they agreed he would call back to a number "Juan" gave him in half an hour to make final arrangements.

At 6:15 p.m. the same day, Brill called the number and a man again identifying himself as "Juan Carlos" answered, said Leon "just went home" and gave Brill a number he said was Leon's house where he

---

* The Honorable Hubert L. Will, Senior District Judge of the Northern District of Illinois, is sitting by designation.

could be reached. Three minutes later, at 6:18, Brill called the number and a man who identified himself as "Leon" answered, said he was "in my house" but didn't want to talk from there. He asked Brill to give him a number where Brill could be reached and he would call back from another place in three minutes.

At 6:30, "Leon" called back, they discussed quantities, delivery dates and money. Leon said his brother Juan was coming to Milwaukee but he was not and reminded Brill he had met Juan "in the hotel" "in the airport." Brill wanted "ten," Leon said "seven or eight." They agreed Brill would be available Friday night, November 8, in Milwaukee. Leon then told Brill that it might be as late as 10:00 p.m. and that Juan "looks just like me."

On November 8, Brill and Leon had another telephone conversation about when Juan would arrive and why Leon was not coming himself. Leon again said Juan "looks just like me." Also, "he has my same voice and everything" and that Brill had met Juan at the Hilton in Chicago, apparently referring to the O'Hare Hilton which was consistent with "Juan's" earlier statement to Brill that they had met "months ago" "at the hotel" "downstairs at the airport."

About 9:00 p.m. on November 8, the appellant, Juan Carlos Puerta Restrepo, arrived at the Milwaukee airport accompanied by a female. He made a number of telephone calls from pay phones at the airport to a number which was supposedly Brill's pager though actually in DEA Agent Hehr's possession. Juan and his companion left the airport and checked in at the Quality Inn where he again called the pager number from a lobby pay phone and then from his room, 114.

Later Brill called him in his room and asked when they would be getting together. Juan replied the next day. Brill said he was supposed to leave town then. Juan said he was waiting "for this guy to come in" possibly about one or two in the morning. They agreed that Brill would call him around one in the morning to see if "this guy" had arrived.

Later about 10:45 p.m., Brill called Juan at his room and said he was going to be in the area and would "cruise over and get everything taken care of" "as soon as everything's ready and you're all set for me." Juan asked "So you gonna bring that with you" and Brill replied, "Yeah, I'll be all set." Brill instructed Juan to call and place a code on the pager when the other party arrived and he would come right over and "take care of everything."

About 1:15 a.m. on November 9, Ceasar Ramirez and a female companion arrived in a grey Audi at the Quality Inn and ultimately checked into Room 112 next to Room 114 occupied by appellant and his companion. About 2:30 a.m. all four were arrested and their rooms searched. The keys to the Audi were found in appellant's room, 114, along with a Quality Inn "comment card" on which was written "335" multiplied by "7" and a total of "234500." Seven kilograms of heroin were found secreted in the Audi. Also on the card the number "140000" was written to which was added the "234500" and a total of "374.-500."

When arrested, the appellant asked the arresting officers what was going on. He was read his rights and then asked where the cocaine was. He said he did not know what they were talking about and had just come to Milwaukee with his girlfriend.

## APPELLANT'S CONTENTIONS

The appellant's principal contention is that the district court improperly admitted into evidence the November 6, 1985 tape of a 5:45 p.m. conversation between Brill and a person who identified himself as "Juan Carlos" on the ground that the government had not established by clear and convincing evidence that the person with whom Brill was talking was appellant. *See United States v. Keck*, 773 F.2d 759, 766 (7th Cir. 1985); *United States v. Faurote*, 749 F.2d 40, 43 (7th Cir.1984).

The appellant concedes that Brill talked to him, the "real" Juan Carlos, at 6:15 p.m. when he told Brill that Leon had left to go to his house and gave Brill his telephone

number. He urges that the substance of the 6:15 p.m. conversation indicates that this was the first time that he had talked with Brill, wasn't aware of the prior conversation or its subject matter and, that given the length, with beepers and pagers, to which Brill and Leon went to defeat surveillance or telephone interception, it is inconceivable that Juan would have given Brill Leon's home telephone number had he been a member of the conspiracy. He points out that when Brill called Leon at the number given to him by Juan, Leon refused to talk to him, asked Brill for a number where he could be reached and called him at that number. He also asked Brill who had given him the home telephone number. When told it was Juan Carlos, Leon told Brill he did not like to talk from his home and not to call him at that number again.

Rule 901(a) of the Federal Rules of Evidence provides:

(a) General provision. The requirement of authentication or identification as a condition precedent to admissibility is satisfied by evidence sufficient to support a finding that the matter in question is what its proponent claims.

■ Appellant contends that the failure of the prosecution to have anyone identify the voice of the person to whom Brill spoke at 5:45 p.m. as that of Juan Carlos or of the same person to whom he spoke at 6:15 p.m. who was admittedly Juan Carlos, even though a number of witnesses were available who could have done so, is a failure of authentication. He points out, correctly, that self-identification by a speaker alone is not sufficient authentication. *See, e.g.,* *United States v. Pool,* 660 F.2d 547, 560 (5th Cir.1981).

On the other hand, it is not necessary that someone familiar with the speaker's voice identify it. *United States v. Bonanno,* 487 F.2d 654, 659 (2d Cir.1973). The authentication may be established by circumstantial evidence such as the similarity between what was discussed by the speakers and what each subsequently did. *United States v. Hassell,* 547 F.2d 1048, 1055 (8th Cir.1977), *cert. denied,* 430 U.S. 919, 97 S.Ct. 1338, 51 L.Ed.2d 599 (1977).

The government points out that in the first conversation at 5:45 p.m. on November 6, between Brill, who had called back a number he had received on his beeper, and a man who identified himself as Leon's brother, "Juan, Juan Carlos," the speaker told Brill they had met on a previous occasion "months ago" "with Mike" "at the hotel one day" "downstairs at the airport." He then said they were having difficulty finding "something just the way you like it" and that "this person" would not leave until the next morning and arrived in Milwaukee on Friday, November 8. The speaker went on to describe the problems they were having procuring quantities of quality cocaine. Brill said he would call back in half an hour to confirm if he could make a Friday meeting whereupon the speaker gave Brill a different phone number to call explaining that in half an hour no one would be at the number Brill had just called.

In half an hour Brill called the new number and appellant concedes that he answered and spoke to Brill. They had a somewhat cryptic conversation which, the appellant urges, indicates that he was unaware of the earlier conversation. When Brill said "This is Jimmy," Juan Carlos said "Yeah," indicating he knew who "Jimmy" was. When Brill asked for Leon, Juan told him Leon had gone home and gave him Leon's home phone number, a further indication that he knew "Jimmy" and knew that "Jimmy" had reason to talk to Leon.

Brill and the DEA agents, of course, were primarily interested in having Leon bring cocaine to Wisconsin. Brill had participated in a number of large cocaine transactions with Leon involving hundreds of thousands if not millions of dollars. As the government points out, there is no logical reason why Leon should have posed as Juan in the first conversation, asked Brill to call back in half an hour and given him a number to call which, when he did, Juan admittedly answered and Leon was not there. If Leon had made the first call and arranged for Brill to call him at a new

number in half an hour, it is unlikely that he would not have waited for Brill to call, particularly when he obviously was anxious to talk to Brill.

In a later phone conversation at 6:30 p.m. on November 6, Leon told Brill that Juan was "gonna go" and that he, Leon, was not coming. He reminded Brill, as had the speaker in the 5:45 p.m. conversation, that Brill had met Juan "in the hotel" "in the airport." The government urges that it also is unlikely that, if Leon had been posing as Juan in the first conversation, forty-five minutes later he would have repeated the reminder that Brill had met Juan previously at the hotel in the airport.

Two days later, of course, on November 8, the appellant arrived in Milwaukee as predicted in the various telephone conversations and started attempting to reach Brill by telephoning his pager, first from the airport, then the hotel lobby and finally from his room. When Brill called Juan's room that evening they had two conversations which, while somewhat disguised, clearly indicated that Juan was awaiting the arrival of someone early the next morning and would call Brill's pager as soon as "everything's ready" at which time Brill would come right over and "take care of everything."

As previously indicated, Ramirez arrived about 1:15 a.m. and checked into the room next to Juan's. At about 2:30 a.m., when the two males and their female companions were arrested, the keys to the Audi in which were secreted some seven kilograms of cocaine were in appellant's room, 114, as was the card containing the calculations which could be read as indicating the amount Brill owed Leon, 7 × 33500 totalling $234,500 for the seven kilograms to be delivered when Ramirez arrived at $33,500 per kilo, halfway between Brill's price of $33,000 a kilo and Leon's $34,000. To this was added $140,000, an amount consistent with the figure of 146 found on a piece of paper in Brill's car when he was arrested which, the government contends, represented Brill's past indebtedness to Leon.

Finally, the government points out that one of the difficulties in producing a wit-ness who could identify Juan's voice was that, as Leon had told Brill about Juan on November 8, "he has my same voice and everything." Accordingly, the government contends there was sufficient authentication by circumstantial or other evidence to warrant admission of the tape of the 5:45 p.m. telephone conversation between Brill and the individual identifying himself as "Juan."

The government also contends that the tape in question was admissible in Juan's trial even if the speaker was Leon posing as Juan. It points out that the appellant does not challenge on appeal the admission of the other conversation in which he admittedly was the speaker or any of the other conversations between Leon and Brill, apparently recognizing that Juan's conduct after his arrival in Milwaukee was sufficient to establish that he was a co-conspirator with Leon in the cocaine delivery-money collection operation and that, accordingly, the conversation was admissible as one by a co-conspirator in furtherance of the conspiracy whether Juan or Leon was the speaker.

In response, the defense contends that at the trial the government did not attempt to use the conversation as that of a co-conspirator but contended that it was an admission by appellant. Accordingly, it asserts that the conviction should be overturned unless the government can show by clear and convincing evidence that Brill was speaking to appellant.

The appellant also contends that it was prejudicial error to permit the jury to keep the tape transcripts during their deliberations notwithstanding this court's holding in *United States v. Dorn*, 561 F.2d 1252 (7th Cir.1977).

Appellant's final contention is that the prosecutor's closing remarks were prejudicial error when he emphasized a defendant's right not to testify at a trial and stated that the judge would instruct the jury that defendants have an absolute right not to testify and the jury could not infer anything from the fact that they did not testify. When defense counsel objected, the court explained to the jury that defend-

ants did have the right not to testify and it would be a constitutional violation for a prosecutor to comment on a defendant's failure to testify. He then told the jury he was overruling the defendant's objection because the prosecutor had accurately stated the law although it might have been wiser if he had not said anything.

## ANALYSIS AND DECISION

■ With respect to the appellant's first contention that admission of the tape of the 5:45 p.m. conversation between Brill and a person identifying himself as "Juan Carlos," Leon's brother, was error, we agree that there was sufficient authentication by clear and convincing, albeit largely circumstantial, evidence, that the speaker was in fact Juan. As previously indicated, there is no logical reason why Leon who had had substantial and extended dealing with Brill should have posed as Juan. Nor was there any reason why, in the second call which Juan admits was with him, he would have answered "Yeah" when Brill said "This is Jimmy" and given Brill Leon's home phone number if he didn't know who Jimmy was and that Leon wanted to talk to him.

It is also illogical, if Leon posing as Juan in the first call and having given Brill a number to call in half an hour, didn't wait for the call but went home. Equally illogical is the fact that, if Leon was the speaker in both the 5:45 p.m. conversation and the 6:30 p.m. conversation on November 6, he would have repeated to Brill in both conversations forty-five minutes apart the reminder that Brill had met Juan downstairs at the airport in the hotel. The later conversation was undisputably with Leon. The clear inference is that the earlier conversation was with Juan and that Leon at the time of the later conversation did not know that Juan had already reminded Brill of their earlier meeting.

Juan's subsequent conduct is corroborative of his participation in the earlier conversation in which the speaker also told Brill they were having difficulty finding what he wanted and, as a result, "this person" would not be leaving until the morning. Juan came to Milwaukee on November 8, made a number of efforts to contact Brill, had two incriminating conversations with him about meeting when everything was ready which were cryptic but clearly susceptible of the conclusion that they were discussing the delivery of cocaine and the payment of money. When arrested, the keys to the car containing seven kilograms of cocaine were in Juan's room as was a card containing calculations susceptible of the conclusion that they represented Brill's obligation to Leon for past deliveries as well as the seven kilograms.

■ The tape was admissible not only because authenticated by clear and convincing evidence but, even if Leon was the speaker, as statements of a co-conspirator in furtherance of the conspiracy under this court's holding in numerous cases and, in particular, *United States v. Santiago*, 582 F.2d 1128 (7th Cir.1978). The trial court found that the tapes of all nine conversations including the one in question were admissible under *Santiago* as co-conspirator statements. The evidence overwhelmingly substantiates that finding.

Appellant mistakenly assumes that, because the prosecution contended that Juan was the speaker in the 5:45 p.m. telephone conversation, the tape was admissible unless it was established by clear and convincing evidence that he was. If the evidence established, as it did, a conspiracy in which Leon and Juan were participants, the conversation was admissible regardless of which of them was the speaker. Nor did the prosecution argue to the jury that the speaker in the call in question was Juan. Rather it characterized him as a "person identifying himself as Juan Carlos." And in closing argument, the prosecutor urged the jury to "give the benefit of the doubt" on who the speaker was to the appellant and acknowledged that "if the government's case depended on establishing to you beyond a reasonable doubt that the man in this phone call was Juan Carlos, I'd sit down right now."

■ With respect to the appellant's contention that the prosecutor's reference to a defendant's right not to testify was preju-

dicial error since it called attention to the fact that he had not taken the stand, we agree with the trial judge that, although the statement was accurate, it would have been wiser not to have said anything. The court's explanation to the jury, however, neutralized any possible prejudice to the appellant. Moreover, the evidence as to the appellant's guilt was so substantial that it is difficult to see how the prosecutor's reference to a defendant's right not to take the stand, which we agree is unwise and might prejudice the verdict in a close case, could have affected the verdict here.

 Finally, we see no merit in the contention that permitting the jury to have the transcripts of the tapes during their deliberations was reversible error. We have previously held in *Dorn, supra,* and *Keck, supra,* that permitting the jury to have the transcripts as well as the tapes is not error. In the instant case, the trial judge twice advised the jury that the tapes not the transcripts constituted the evidence. Appellant does not dispute the accuracy of any of the conversations in the transcripts but urges that since the transcript of the 5:45 p.m. tape identified the speakers as Brill and "Juan" in quotes it was prejudicial.

We have already found that the evidence clearly and convincingly established that the second speaker in that conversation was in fact Juan. Even if it had not, we find that permitting the jury to have the transcripts with the speakers identified as indicated was not error.

## CONCLUSION

The tape of the November 6, 1985, 5:45 p.m. conversation between Brill and a person identifying himself as Juan Carlos, Leon Puerta Restrepo's brother, was authenticated by clear and convincing evidence and was, therefore, admissible. It was also admissible as the statement of a co-conspirator in furtherance of the conspiracy. Neither permitting the jury to have the admittedly accurate transcripts of the taped conversations during their deliberations, nor the prosecutor's closing reference to a defendant's absolute right not to testify was prejudicial error although we disapprove of such statements in closing arguments, since they may tend to call attention to a defendant's failure to take the stand and, as here, make a corrective explanation by the trial judge necessary, or, in a close case require a reversal. The convictions are affirmed.