**UNITED STATES of America,**
**Plaintiff–Appellee,**

v.

**Dale J. DOERR, John Paul Doerr, Josephine Christofalos, Christa D. Pixley, and Archie J. Pixley, Defendants–Appellants.**

Nos. 88–1383, 88–1447, 88–1529, 88–1567 and 88–1578.

United States Court of Appeals, Seventh Circuit.

Argued May 16, 1989.

Decided Oct. 3, 1989.

Nathan A. Fishbach, Asst. U.S. Atty., John E. Fryatt, U.S. Atty., Milwaukee, Wis., for U.S.

Bernard S. Stein, Robert N. Meyeroff, Milwaukee, Wis., for defendant-appellant Dale J. Doerr.

Dennis P. Coffey, Coffey, Coffey & Geraghty, Milwaukee, Wis., for defendant-appellant John P. Doerr.

Janice A. Rhodes, Kravit, Waisbren & Debruin, Milwaukee, Wis., for defendant-appellant Josephine Christofalos.

David E. Lowe, Hachey & Lowe, Milwaukee, Wis., for defendant-appellant Christa Pixley.

Clifford R. Steele, Cunningham, Lyons, Steele & Cramer, Milwaukee, Wis., for defendant-appellant Archie Pixley.

Before COFFEY, RIPPLE, and MANION, Circuit Judges.

RIPPLE, Circuit Judge.

In April 1987, a grand jury returned a two-count indictment against the five appellants in this case. The first count charged each of the five appellants with conspiring to travel in and use the facilities of interstate commerce to promote, carry on, and distribute the proceeds of unlawful activities involving prostitution. *See* 18

U.S.C. § 371; 18 U.S.C. § 1952(a)(1) & (3).[1] The second count charged two of the appellants, John Paul Doerr and Josephine Christofalos, with conspiring to defraud the United States by obstructing the lawful functions of the Internal Revenue Service (IRS). *See* 18 U.S.C. § 371.[2] After a lengthy jury trial, each of the appellants was found guilty of the offense charged in Count One, and John Paul Doerr and Ms. Christofalos were found guilty of the offense alleged in Count Two. All five appellants now challenge their convictions. Their appeals raise a number of different issues for our consideration. We affirm the convictions of all the appellants.

## I.

### Facts

The prostitution activities underlying the offense alleged in Count One of the indictment were concentrated in three businesses that were part of an entity known as Worldwide Enterprises, Incorporated: the WW I Club, located in Kenosha County, Wisconsin; the Relaxation Health Systems massage parlor located next to the WW I Club in Kenosha County; and the WW II Club, located in Lake County, Illinois. The clubs were nude dancing establishments that served no food or alcoholic beverages. The testimony at trial revealed that the prostitution activities at the clubs were conducted pursuant to the following general procedure. A customer entering the club would be required to pay a cover charge. He would then be directed to a table and joined by a "dancer." After being seated, a waitress would approach the customer and ask him if he would like to purchase a drink (water or a soft drink) for himself and the dancer. Once the customer had purchased a drink, the waitress would return and ask the customer if he would like to go to a private area with the dancer. If the customer agreed and purchased a bottle of soda or water, at a cost of forty to fifty dollars, he would be taken to a "terrace," consisting of a number of booths, in the rear of the club. The customer would then be asked to buy additional bottles, and, once sufficient bottles had been purchased, the dancer would engage in sexual acts with the customer.

At the massage parlor, the customer would pay a flat fee for thirty minutes in a private room with a masseuse. The masseuse would then negotiate a "tip" with the customer. The amount of the tip would determine the degree of sexual contact that the masseuse had with the customer. At both the clubs and the massage parlor, customers could pay in cash or by credit card.

Josephine Christofalos assumed control of these businesses when her husband, George Christofalos, died in March 1979. At that time, one of the nightclub waitresses described to Ms. Christofalos the prostitution activities taking place on the premises. During the summer of 1979, Ms. Christofalos retained John Paul Doerr to assist her in managing the enterprise. He moved into a house next to the Kenosha club and massage parlor and maintained close con-

---

**1.** Section 1952 provides in pertinent part that:
 (a) Whoever travels in interstate or foreign commerce or uses any facility in interstate or foreign commerce, including the mail, with intent to—
 (1) distribute the proceeds of any unlawful activity; or
 . . . .
 (3) otherwise promote, manage, establish, carry on, or facilitate the promotion, management, establishment, or carrying on, of any unlawful activity,
and thereafter performs or attempts to perform any of the acts specified in subparagraphs (1) . . . and (3), shall be fined not more than $10,000 or imprisoned for not more than five years, or both.

 (b) As used in this section "unlawful activity" means (1) any business enterprise involving . . . prostitution offenses in violation of the laws of the State in which they are committed or of the United States. . . .
18 U.S.C. § 1952(a) & (b).

**2.** Section 371 provides in pertinent part that:
 If two or more persons conspire either to commit any offense against the United States, or to defraud the United States, or any agency thereof in any manner or for any purpose, and one or more of such persons do any act to effect the object of the conspiracy, each shall be fined not more than $10,000 or imprisoned not more than five years, or both.
 . . . .
18 U.S.C. § 371.

tact with the operations (for example, an intercom system was installed between his house and the club and massage parlor).

The other defendants each played lesser roles in the illegal enterprises. Archie Pixley participated in the management of the Kenosha club and massage parlor, and, when some of the massage parlor masseuses were arrested, Mr. Pixley posted their bail. Mr. Pixley's wife, Christa, was a waitress at the Kenosha club. Dale Doerr participated in the management of the massage parlor. Dale lived in Kenosha with his father, John Paul Doerr, during two different periods: from September 1979 to September 1980 (his junior year in high school) and from September 1981 until May 11, 1982. During the spring of 1982, both Dale and his father left Kenosha and moved to California. While in Kenosha, Dale worked at the businesses managed by his father. He was identified at trial as the massage parlor's assistant manager. In this capacity, he provided instructions on the treatment of customers, on proper work attire, and on scheduling. He also encouraged the massage parlor's masseuses to earn greater revenues by increasing their sexual favors. He sometimes received the massage parlor's receipts at the end of the evening, and, in January 1982, he became involved in the massage parlor's bookkeeping activities. Dale also assisted his father in the operation of RH Credit Systems, a company that processed credit card transactions for the Kenosha club and massage parlor.

Count Two of the indictment is based on a money-laundering scheme engineered by John Paul Doerr and Josephine Christofalos. Much of the evidence of this scheme was discovered during an FBI undercover operation in which the FBI operated a credit card processing business known as the National Credit Service (NCS).[3] Credit card receipts from the nightclubs and massage parlor were forwarded to NCS. NCS then provided payment for the receipts to Ms. Christofalos. At her direction, NCS left the payee line on many of these payment checks blank. Ms. Christofalos deposited most of these checks into various bank accounts, many of which had little connection with the clubs and massage parlor. In addition, eleven of these checks were provided to Mr. Doerr, who, as part of the money-laundering scheme, deposited them in the bank account of a church that he had formed, the Holy Temple of Christ the Redeemer and Early Day Saints Church.[4] The checks were reported to the IRS on the church's tax return as contributions that were exempt from taxation. The government contends that, in this way, Ms. Christofalos and Mr. Doerr avoided reporting significant portions of their businesses' substantial revenues to the IRS and impeded the IRS from accurately computing their income.

## II.

### Analysis

A number of issues are raised by all five appellants jointly, while the individual appellants each raise several other issues. We shall first address those issues raised jointly and then turn to the contentions of individual appellants.

### A.

#### Issues Raised by All Appellants

1. *Improper admission of coconspirators' statements*

■ The coconspirator exception to the hearsay rule, Fed.R.Evid. 801(d)(2)(E), pro-

---

3. In its undercover operation, known as Operation Safe Bet, the FBI operated NCS as a clearing house for credit card transactions in nude and topless dancing clubs in northeastern Illinois and southern Wisconsin. An FBI agent, acting as an officer of NCS, would visit the clubs and collect credit transaction charge slips. NCS would process the charge slips through its own bank accounts and, then, after subtracting a 15% service fee, reimburse the clubs by check.

4. Mr. Doerr also organized an entity known as St. Michael's Southern Catholic Church. This church was located in his home, next to the Kenosha club and massage parlor. According to one of the bartenders at the Kenosha club, Mr. Doerr organized the church and placed a crucifix on his home so that the police would not think that his house was associated with the adjacent club.

vides that a statement is not hearsay if it is "offered against a party and is ... a statement by a coconspirator of a party [made] during the course and in furtherance of the conspiracy." The appellants maintain that two out-of-court statements admitted at trial failed to satisfy the "in furtherance" requirement of the coconspirator exception. In the first challenged statement, Robert Meyer, a frequent customer at the Kenosha club, testified about a conversation between himself and Mr. Pixley in which the two discussed a red curtain at one of the clubs. Meyer testified that Mr. Pixley "mentioned that when he was hired back there that Josephine had a curtain put up in the terrace or the patio area, how ridiculous it was, it was asking for problems with the police." Tr. at 720. In the second challenged statement, John Patrick Doerr, Dale Doerr's half brother, testified that, in a conversation with his brother, Dale had laughed at him and said "I can't believe—I don't believe—I can't believe you don't know what's going on, or you didn't know what's going on." Tr. at 999. While conceding that these two statements may have been admissible against their declarants, Mr. Pixley and Dale Doerr,[5] the appellants maintain that they should not have been admitted against the nondeclarant appellants because the statements were not made "in furtherance" of the conspiracy.

Thus, they contend, Rule 801(d)(2)(E) was not satisfied.[6]

■ We recently emphasized that the "in furtherance" requirement of Rule 801(d)(2)(E) is a *limitation* on the admissibility of coconspirators' statements that is meant to be taken seriously. *See Garlington v. O'Leary*, 879 F.2d 277, 283 (7th Cir.1989). As we explained in *Garlington*, a coconspirator's statement satisfies the "in furtherance" requirement "when the statement is 'part of the information flow between conspirators intended to help each perform his role.'" *Id.* (*quoting United States v. Van Daal Wyk*, 840 F.2d 494, 499 (7th Cir.1988)). We further explained that statements "in furtherance" of a conspiracy can take many forms, including statements made to recruit potential coconspirators, statements seeking to control damage to an ongoing conspiracy, statements made to keep coconspirators advised as to the progress of the conspiracy, and statements made in an attempt to conceal the criminal objectives of the conspiracy. *Id.* Narrative declarations, mere "idle chatter," and superfluous casual conversations, however, are not statements "in furtherance" of a conspiracy. *See id.; see also United States v. Foster*, 711 F.2d 871, 880 (9th Cir.1983) (mere narrative declarations, made without intent to induce assistance to

5. *See* Joint Br. at 17. For example, the statements could have been admitted against their declarants under Fed.R.Evid. 801(d)(2)(A) ("A statement is not hearsay if ... [it] is offered against a party and is ... the party's own statement in either an individual or a representative capacity....").

6. The government contends that the appellants' objections to both of the challenged statements should be rejected as untimely. The government maintains that the appellants' objection to the Meyer statement was waived because no objection was made when the testimony was presented on November 25, 1987. Rather, the appellants' objected to the statement five days later, on November 30, 1987. The government asserts that the appellants' objection to the John Patrick Doerr statement, which was made during cross-examination of Doerr, was waived because similar testimony was elicited during Doerr's direct examination. On the record before us, we reject the government's contentions.

The appellants objected to the Meyer statement on the first trial day after the challenged testimony had been presented. Five days had passed only because the Thanksgiving holiday weekend intervened. Moreover, when the appellants made their objection on November 30, the district court disregarded the government's argument that any objection was untimely and ruled on the appellants' challenge to the statement. *See* Tr. at 751–52. With regard to the John Patrick Doerr statement, the appellants made their hearsay objection as soon as it was clear that testimony regarding an out-of-court *statement* had been presented. During direct examination, John Patrick Doerr had merely stated that Dale "kind of laughed and thought it was funny that I didn't know yet what was going on." Tr. at 894. In contrast, during his cross-examination, John Patrick Doerr clearly testified as to a statement made by Dale. *See* Tr. at 999.

Because the district court ruled on the appellants' objection to the Meyer statement and their objection to the Doerr statement was made in a timely fashion, we shall reach the merits of the appellants' objections.

the conspiracy, do not satisfy the "strict requirements" of Rule 801), *cert. denied,* 465 U.S. 1103, 104 S.Ct. 1602, 80 L.Ed.2d 132 (1984); *United States v. Lieberman,* 637 F.2d 95, 102 (2d Cir.1980) (challenged testimony "smack[ed] of nothing more than casual conversation about past events. It is difficult to envision how it would have furthered the conspiracy.").

 A district court's finding that a particular statement was made "in furtherance" is reviewed under a clearly erroneous standard. *United States v. Shoffner,* 826 F.2d 619, 627–28 (7th Cir.), *cert. denied,* 484 U.S. 958, 108 S.Ct. 356, 98 L.Ed.2d 381 (1987). In addition, a court may conclude that the challenged statement was "in furtherance" even though " 'the statement [was] susceptible of alternative interpretations.' " *Id.* at 628 (quoting *United States v. Mackey,* 571 F.2d 376, 383 (7th Cir.1978)). Moreover, the "in furtherance" requirement is satisfied so long as " 'some reasonable basis exists for concluding that the statement furthered the conspiracy.' " *Id., quoted in Garlington, supra,* at 283.

 The government contends that the district court had a reasonable basis for concluding that Mr. Pixley's statements, described at trial by Meyer, were made "in furtherance" of the conspiracy. The government explains that, in addition to being a frequent customer, Robert Meyer had an interest in investing in the Kenosha club. Given this interest, the government asserts that "the trial court had a 'reasonable basis' for concluding that Pixley's comments were made in furtherance of the conspiracy since Pixley and Meyer had an interest in discussing ways that the club could improve and remain in operation." Government Br. at 19. The government

also contends that Dale Doerr's statement was "in furtherance" of the conspiracy, because it was a description of the clubs' illegal activities to John Patrick Doerr, a coconspirator who worked at the clubs as a manager and doorman.

We cannot accept the government's contentions. Therefore, we conclude that the district court erred in admitting the challenged testimony. Neither Mr. Pixley's statement nor Dale Doerr's statement was made "in furtherance" of the conspiracy. After reviewing Robert Meyer's testimony, we conclude that Mr. Pixley's discussion of the red curtain with Meyer cannot reasonably be characterized as part of an attempt to induce Meyer to join or assist the conspiracy. Instead, the statements are more accurately characterized as a narrative discussion of a past event. As such, they do not satisfy the "in furtherance" requirement of Rule 801(d)(2)(E).[7]

 Similarly, Dale Doerr's statement to John Patrick Doerr fails to satisfy the "in furtherance" requirement. In making the statement recounted by John Patrick Doerr at trial, Dale was mocking his half-brother's ignorance of the clubs' unlawful activities; such a statement cannot be characterized as part of the normal information flow between coconspirators and in no way furthered the ends of the conspiracy. Thus, neither Mr. Pixley's statement nor Dale Doerr's statement should have been admitted under Rule 801(d)(2)(E).

 The improper admission of these statements, however, does not constitute reversible error. Nonconstitutional errors, like the evidentiary errors in this case, are governed by the harmless error standard of Rule 52(a) of the Federal Rules of Criminal Procedure.[8] "Any error, defect, irregularity or variance which does not affect

---

7. The district court itself had concluded that discussions between Mr. Pixley and Meyer regarding investment by Meyer in the club were *not* in furtherance of the conspiracy. *See* Tr. at 752. The court had, however, concluded that Mr. Pixley's statements about the red curtain were "in furtherance," because they illustrate a "desire to increase the efficiency in the remunerative nature of the conspiracy." *Id.* While the statements may in fact illustrate such a desire on the part of Mr. Pixley, the district

court's finding does not explain how *making this statement to Meyer* in any way furthered the conspiracy.

8. None of the appellants suggest that the admission of these statements constitutes error of constitutional magnitude and the weight of authority suggests that such error need not be considered a violation of the confrontation clause in every instance. *See, e.g., Dutton v. Evans,* 400 U.S. 74, 91 S.Ct. 210, 27 L.Ed.2d 213

substantial rights shall be disregarded." Fed.R.Crim.P. 52(a); *United States v. York*, 852 F.2d 221, 226 n. 3 (7th Cir.1988). "Only if we are convinced that the error did not influence the jury or had only a very slight effect, and can so say with fair assurance, should we hold the error as harmless." *United States v. Zapata*, 871 F.2d 616, 622 (7th Cir.1989); *see also United States v. Grier*, 866 F.2d 908, 920 (7th Cir.1989) (where the error has had "no 'substantial influence on the verdict,'" reversal is not warranted) (quoting *United States v. Kotteakos*, 328 U.S. 750, 765, 66 S.Ct. 1239, 1248, 90 L.Ed. 1557 (1946)).

■ We are convinced that the erroneous admission of the challenged statements in this case had no substantial influence on the jury's verdict. Witnesses other than Meyer testified that they knew that Ms. Christofalos had been involved in the placement of a curtain in the rear of the clubs. Similarly, Dale Doerr's statement to his brother was hardly the only testimony showing that unlawful activity was obvious at the clubs; many witnesses testified that the appellants knew prostitution was occurring at the clubs and massage parlor. We therefore conclude that the district court's erroneous admission of the challenged hearsay statements was harmless.

### 2. *Admission of Anthony Barbaro's grand jury testimony*

On May 25, 1982, Anthony Barbaro, who had been employed at the massage parlor in 1981, testified before a grand jury investigating this case. Barbaro told the grand jury that prostitution had been going on at the massage parlor and that he had deposited cash from the massage parlor in the bank account of St. Michael's Southern Catholic Church (a church established by John Paul Doerr),[9] using deposit slips made out by John Paul Doerr or Dale Doerr. Just prior to trial, the district court granted the government's motion for formal immunity for Barbaro during the trial. During the immunity hearing on November 13, 1987, however, Barbaro stated that he would not testify. On November 23, 1987, Barbaro's counsel again stated that he would not testify. The United States called Barbaro as a witness on November 25. He refused to testify, and both the government and the district court reminded him of his immunity and warned him that he was subjecting himself to both civil and criminal contempt. Barbaro again refused to testify and stated, "[h]ow many times we got to go through this? I am not testifying." Tr. at 618. The court ordered Barbaro to answer the question posed by the government and asked, "[a]re you refusing or are you going to?" *Id.* Barbaro responded, "I have said it twice already." *Id.* The court then found Barbaro to be in civil contempt and ordered that he be confined until he was willing to testify.[10] On November 29, 1987, the district court issued a written

(1970); *United States v. Weinstein*, 762 F.2d 1522, 1535–36 & n. 8 (11th Cir.1985), *cert. denied*, 475 U.S. 1110, 106 S.Ct. 1519, 89 L.Ed.2d 917 (1986); *United States v. Foster*, 711 F.2d 871, 880–81 (9th Cir.1983), *cert. denied*, 465 U.S. 1103, 104 S.Ct. 1602, 80 L.Ed.2d 132 (1984); *United States v. Castillo*, 615 F.2d 878, 883 (9th Cir.1980). However, even if we assume, *arguendo*, that this error is of constitutional magnitude, we are confident that it is harmless beyond a reasonable doubt. *Chapman v. California*, 386 U.S. 18, 24, 87 S.Ct. 824, 828, 17 L.Ed.2d 705 (1967).

**9.** *See* note 4 *supra*.

**10.** This sanction was imposed pursuant to 28 U.S.C. § 1826. That provision provides, in pertinent part, that:

(a) Whenever a witness in any proceeding before or ancillary to any court or grand jury of the United States refuses without just cause shown to comply with an order of the court to testify or provide other information, ... the court, upon such refusal ... may summarily order his confinement at a suitable place until such time as the witness is willing to give such testimony or provide such information. No period of such confinement shall exceed the life of—

(1) the court proceeding, or

(2) the term of the grand jury, including extensions,

before which such refusal to comply with the court order occurred, but in no event shall such confinement exceed eighteen months.

18 U.S.C. § 1826(a).

At this time, Barbaro was already serving a prison sentence for a second-degree murder conviction in Florida. The appellants contend that, when Barbaro's grand jury testimony was presented, the jury was not informed that he was a convicted murderer. This is incorrect.

order advising Barbaro that he could purge himself of his contempt by testifying and telling him that, should he change his mind, he should inform the court immediately of his willingness to testify. *See* J.P. Doerr R.66.[11] At no point during the trial did Barbaro inform the court of his willingness to testify. He ultimately was held in criminal contempt and sentenced to 18 months' imprisonment.

On November 25, the government had asked the court to declare Barbaro unavailable for trial. The court reserved ruling on this matter pursuant to defense counsels' request for more time to study the issue. On December 16, 1987, the court, over the defendants' objection, permitted the government to introduce portions of Barbaro's grand jury testimony. As noted above, Barbaro at no time informed the court of his willingness to testify. *See* J.P. Doerr R.176.

On appeal, the appellants maintain that introduction of Barbaro's grand jury testimony was improper under both Rule 804(b)(5) of the Federal Rules of Evidence (the catch-all hearsay exception)[12] and the confrontation clause of the sixth amendment,[13] because Barbaro was not shown to be unavailable *on the day that his grand jury testimony was presented to the jury* and no other evidence corroborated the substance of his testimony. John Paul

Doerr asserts that the district court made an "anticipatory" ruling that Barbaro was unavailable when it simply concluded that, because Barbaro had previously refused to testify, he would not testify at any point in the future. The court's determination that Barbaro was unavailable was, therefore, improper, since the court failed to inquire at the time the grand jury testimony was to be used whether or not the witness was still recalcitrant. *See* J.P. Doerr Br. at 6–7.

### a. Rule 804(b)(5)

In order for a hearsay statement to be admissible under Rule 804(b)(5), the proponent of the statement must show that the declarant is unavailable and that the statement contains " 'circumstantial guarantees of trustworthiness' equivalent to those inherent in the more specific exceptions provided under Rule 804(b)(1)–(4)." *United States v. Snyder,* 872 F.2d 1351, 1354 (7th Cir.1989). We review the district court's decision that a particular hearsay statement is admissible under Rule 804 only for an abuse of discretion. *See id.; see also United States v. Fuesting,* 845 F.2d 664, 673 (7th Cir.1988) ("We will reverse a district court's evidentiary ruling only where there has been a clear abuse of [the court's broad] discretion."). We shall turn first to unavailability and then ad-

---

The district court clearly advised the jury that Barbaro had been convicted of second-degree murder and informed them that that fact could be considered by them in assessing his credibility. *See* Tr. at 2708.

**11.** The order provided in part that
Barbaro be held in custody until the end of the trial. The Court hereby advises the witness that he may purge himself of his contempt by answering the questions asked. If he changes his mind, Barbaro should inform the Court immediately of his willingness to testify. The witness may avoid prosecution for criminal contempt if he purges himself of civil contempt.
J.P. Doerr R. 66 at 2.

**12.** (b) Hearsay Exceptions. The following are not excluded by the hearsay rule if the declarant is unavailable as a witness:
. . . .
(5) Other exceptions. A statement not specifically covered by any of the foregoing exceptions but having equivalent circumstantial

guarantees of trustworthiness, if the court determines that (A) the statement is offered as evidence of a material fact; (B) the statement is more probative on the point for which it is offered than any other evidence which the proponent can procure through reasonable efforts; and (C) the general purposes of these rules and the interests of justice will best be served by admission of the statement into evidence. However, a statement may not be admitted under this exception unless the proponent of it makes known to the adverse party sufficiently in advance of the trial or hearing to provide the adverse party with a fair opportunity to prepare to meet it, the proponent's intention to offer the statement and the particulars of it, including the name and address of the declarant.
Fed.R.Evid. 804(b)(5).

**13.** "In all criminal prosecutions, the accused shall enjoy the right ... to be confronted with the witnesses against him." U.S. Const. amend. VI.

dress the "circumstantial guarantees of trustworthiness" supporting admission of Barbaro's grand jury testimony.[14]

i. *unavailability.* Rule 804 provides that unavailability as a witness includes situations in which the declarant "persists in refusing to testify concerning the subject matter of the declarant's statement despite an order of the court to do so." Fed.R.Evid. 804(a)(2).[15] The government contends that, since Barbaro *had* repeatedly refused to testify and had not notified the court of his willingness to testify pursuant to its November 29 order, the appellants' assertion that Barbaro had not been shown to be unavailable on the day his grand jury testimony was introduced is meritless.

▮ The district court did not err in concluding that Barbaro was unavailable as a witness for the purposes of Rule 804(b)(5). Barbaro repeatedly refused to testify despite a grant of immunity and the threat of contempt sanctions. He was directly ordered by the court to answer the government's questions and refused to do so. He was then held in civil contempt and ordered confined until he was willing to testify. Moreover, he was explicitly informed that if he testified he would be purged of his contempt and that he should immediately inform the court if he should change his mind. The court never received notice from Barbaro of any decision to testify. Under these circumstances, Barbaro's persistence had been adequately tested, *see United States v. Boulahanis,* 677 F.2d 586, 588 (7th Cir.), *cert. denied,* 459 U.S. 1016, 103 S.Ct. 375, 74 L.Ed.2d 509 (1982), and the court properly concluded that the unavailability requirement of the rule had been satisfied.

Mr. Doerr's assertion, accompanied by citation to *United States v. Johnson,* 736 F.2d 358 (6th Cir.1984), that the district court erroneously anticipated Barbaro's refusal to testify without giving him a chance to change his mind, *see* J.P. Doerr Br. at 6, is unfounded. The district court in *Johnson* improperly held a witness in civil contempt merely because, at a pretrial hearing *before* any order to testify had been imposed, the witness stated that he *intended* to refuse to testify. 736 F.2d at 359–60. No actual refusal to testify had occurred and the trial itself had not even started. In contrast, Barbaro had actually refused to testify, had properly been held in civil contempt for doing so, and had explicitly been given, by court order, an open invitation to change his mind. Thus, Barbaro *was* "unavailable" as defined in Rule 804—he obstinately had persisted in his refusal to testify despite a court order to do so. Requiring the government to bring Barbaro back into court on December 16 solely so that he could refuse to testify once more would have served little purpose.

ii. *circumstantial guarantees of trustworthiness.* As noted above, in addition to demonstrating unavailability, Rule 804(b)(5) requires that a hearsay statement not covered by some other exception be supported by "equivalent circumstantial guarantees of trustworthiness" before it can be admitted. A trial judge has " 'considerable discretion' " in determining whether " 'hearsay statements contain the necessary circumstantial guarantees of trustworthiness' " to be admissible under the federal rules. *See United States v. Guinan,* 836 F.2d 350, 354 (7th Cir.), *cert. denied,* —— U.S. ——, 108 S.Ct. 2871, 101 L.Ed.2d 907 (1988) (quoting *United States v. Vretta,* 790 F.2d 651, 659 (7th Cir.), *cert. denied,* 479 U.S. 851, 107 S.Ct. 179, 93 L.Ed.2d 115 (1986)). The factors that should be considered by the district court in assessing

---

**14.** The proponent must also establish that the proffered hearsay statement is evidence of a material fact that is more probative than other evidence that could reasonably be procured and that admission of the statement will serve the general purposes of the rules of evidence and the interests of justice. *See* Fed.R.Evid. 804(b)(5)(A)–(C); note 12 *supra; United States v. Wilkus,* 875 F.2d 649, 655 (7th Cir.1989). The

appellants do not contend that these requirements have not been met.

**15.** *See also* Fed.R.Evid. 804(a)(2) advisory committee's note ("A witness is rendered unavailable if he simply refuses to testify concerning the subject matter of his statement despite judicial pressures to do so, a position supported by ... considerations of practicality.").

the trustworthiness of hearsay testimony include:

the character of the witness for truthfulness and honesty, and the availability of evidence on the issue; whether the testimony was given voluntarily, under oath, subject to cross-examination and a penalty for perjury; the witness' relationship with both the defendant and the government and his motivation to testify before the grand jury; the extent to which the witness' testimony reflects his personal knowledge; whether the witness ever recanted his testimony; the existence of corroborating evidence; and, the reasons for the witness' unavailability.

*Snyder*, 872 F.2d at 1355–56. This list of factors is neither exhaustive nor absolute, and each case must be analyzed on its own facts. *Id.; United States v. York*, 852 F.2d 221, 225 (7th Cir.1988); *United States v. Hooks*, 848 F.2d 785, 797 (7th Cir.1988); *Guinan*, 836 F.2d at 355.

 Our review of the record reveals that a number of the factors supporting admissibility are present in this case. For example, although Barbaro's grand jury testimony was not subject to cross-examination, it was given under oath and subject to a penalty for perjury.[16] Barbaro was explicitly informed that he had a constitutional right not to answer any question that he chose not to answer, he acknowledged that he had been placed under oath, and he recognized that perjury is a felony. *See* Tr. at 2712–14. More importantly, there is no indication that Barbaro was pressured to testify. *See Boulahanis*, 677 F.2d at 588. Indeed, he testified before the grand jury *voluntarily;* he had not been granted any form of immunity at that time. *See* Tr. at 2713. Because Barbaro's testimony was not given under a grant of immunity, he exposed himself to potential criminal liability for the distribution of funds generated by prostitution. *See* 18 U.S.C. § 1952(a)(1). Thus, his grand jury testimony has the circumstantial guarantee of

trustworthiness supporting the hearsay exception for statements against interest. *See* Fed.R.Evid. 804(b)(3) advisory committee's note ("The circumstantial guaranty of reliability for declarations against interest is the assumption that persons do not make statements which are damaging to themselves unless satisfied for good reason that they are true."). In addition, Barbaro's testimony was based entirely on his own personal knowledge—he revealed what he saw on the job and what his duties were as a security guard at the Kenosha massage parlor. *See Snyder*, 872 F.2d at 1356. Moreover, the appellants have not identified any incentive to manufacture false testimony that Barbaro may have had. *See Guinan*, 836 F.2d at 355; *see also Hooks*, 848 F.2d at 797 ("Another indicium of reliability is the declarant's disinterest; the testimony of a 'mere bystander with no axe to grind' tends to be more trustworthy.") (quoting *Boulahanis*, 677 F.2d at 588); *United States v. Howard*, 774 F.2d 838, 845 (7th Cir.1985) (statements made by a "seemingly disinterested witness under circumstances that created no apparent motive to lie"). While Barbaro has been convicted of second-degree murder, the jury was apprised of his conviction before his testimony was placed in evidence.[17]

Certain aspects of Barbaro's testimony are also corroborated by other evidence introduced at trial. For example, IRS Special Agent Gerald Ontko testified that St. Michael's Church did maintain a bank account in Kenosha and that the bulk of the deposits into that account were made in cash. *See* Tr. at 2562–63; Government Ex. 353–C (73% of deposits made in currency). In addition, the account's signature card was signed in the name of the "Rev. James Jackson." *See* Government Ex. 353–A. This was a name that Barbaro testified he knew John Paul Doerr used. *See* R. 178 at 5 (Tr. of Barbaro Grand Jury Testimony). The government also presented documentary evidence of a deposit slip initialed by

---

**16.** This factor alone, however, may not "markedly enhance the reliability of [a witness'] testimony." *Snyder*, 872 F.2d at 1355; *see also id.* (" '[T]hat evidence was given before a grand jury adds little to its reliability.' ") (quoting *Garner v.*

*United States*, 439 U.S. 936, 938, 99 S.Ct. 333, 335, 58 L.Ed.2d 333 (1978) (Stewart & Marshall, JJ., dissenting from denial of certification)).

**17.** *See* note 10 *supra*.

"DJD" (Dale J. Doerr), indicating a cash deposit into the account of St. Michael's Church. Government Ex. 353–B at 28. John Paul Doerr himself also admitted on cross-examination that the deposit slips showing cash deposits into the St. Michael's account were made in his handwriting. *See* Tr. at 3732–34. Further, Barbaro's testimony that he deposited cash from the massage parlor into a church account is consistent with the evidence that John Paul Doerr laundered other prostitution-related funds through the Holy Temple of Christ the Redeemer Church. *See* Tr. at 2500–19. Finally, many witnesses corroborated Barbaro's testimony that prostitution occurred in the massage parlor.

The appellants maintain that "crucial points" of Barbaro's testimony were not corroborated. Joint Br. at 24. However, "a court cannot require that every detail of an item of hearsay testimony be corroborated before admitting it under Rule 804(b)(5)." *Guinan*, 836 F.2d at 357; *see also Snyder*, 872 F.2d at 1356 ("While Snyder did not confirm every detail of Barton's testimony, he conceded enough to make the whole adequately trustworthy."). Because Barbaro's grand jury testimony did contain adequate "circumstantial guarantees of trustworthiness," we conclude that the district court did not abuse its discretion under Rule 804(b)(5) in allowing this testimony to be presented to the jury.

### b. Confrontation clause

 Although the hearsay rules and the confrontation clause "stem from the same root, ... the two are not equivalent." *Vretta*, 790 F.2d at 660 (quoting *Dutton v. Evans*, 400 U.S. 74, 86, 91 S.Ct. 210, 218, 27 L.Ed.2d 213 (1970)). Therefore, evidence that is admissible under the catch-all hearsay exception may still violate the sixth amendment. *See Guinan*, 836 F.2d at 358; *see also Snyder*, 872 F.2d at 1355 ("The standards are similar, yet distinct, and reliability may not be inferred under a Sixth Amendment analysis merely because the prior testimony is admissible under Rule 804(b)(5).") (citations omitted). We have explained that, in order to defeat a constitutional challenge to admissibility, the challenged statement must be supported by " 'adequate indicia of reliability to justify the placement of the hearsay statement before the jury.' " *Guinan*, 836 F.2d at 358 (quoting *United States v. Feldman*, 761 F.2d 380, 387 (7th Cir.1985)); *see also Ohio v. Roberts*, 448 U.S. 56, 65–66, 100 S.Ct. 2531, 2538–39, 65 L.Ed.2d 597 (1980); *Snyder*, 872 F.2d at 1354. Even where there has been no opportunity for cross-examination, a statement's admission is not constitutionally barred if the government has demonstrated the unavailability of the witness and has " 'made a strong "showing of particularized guarantees of trustworthiness" concerning the statements.' " *Guinan*, 836 F.2d at 358 (quoting *United States v. Howard*, 774 F.2d 838, 846 (7th Cir.1985) (quoting *Roberts*, 448 U.S. at 66, 100 S.Ct. at 2539)); *Vretta*, 790 F.2d at 660.[18] This court has developed a two-part

---

**18.** The Supreme Court in *Ohio v. Roberts* explained that

> [t]he Confrontation Clause operates in two separate ways to restrict the range of admissible hearsay. First, in conformance with the Framers' preference for face-to-face accusation, the Sixth Amendment establishes a rule of necessity. In the usual case ..., the prosecution must either produce, or demonstrate the unavailability of, the declarant whose statement it wishes to use against the defendant.
>
> The second aspect operates once a witness is shown to be unavailable. Reflecting its underlying purpose to augment accuracy in the factfinding process by ensuring the defendant an effective means to test adverse evidence, the Clause countenances only hearsay

marked with such trustworthiness that "there is no material departure from the reason of the general rule."

448 U.S. at 65, 100 S.Ct. at 2538 (quoting *Snyder v. Massachusetts*, 291 U.S. 97, 107, 54 S.Ct. 330, 333, 78 L.Ed. 674 (1934)) (citations omitted); *see also Bourjaily v. United States*, 483 U.S. 171, 182, 107 S.Ct. 2775, 2782, 97 L.Ed.2d 144 (1987) (to harmonize confrontation clause with society's interest in accurate fact finding, "which may require consideration of out-of-court statements," Supreme Court has "required the prosecution to demonstrate both the unavailability of the declarant and the 'indicia of reliability' surrounding the out-of-court declaration").

As discussed earlier in this opinion, the government has demonstrated Barbaro's unavailability as a witness in this case. *See* Part II.A.2.a.i *supra; see also Roberts*, 448 U.S. at 74,

test based on *Roberts:* statements are constitutionally admissible even in the absence of cross-examination " 'if it is clear (1) that the declarant actually made the statement in question; and (2) there is circumstantial evidence supporting its veracity.' " *Guinan,* 836 F.2d at 358 (quoting *Feldman,* 761 F.2d at 387).[19]

 The first requirement is clearly met in this case—the challenged evidence consists of excerpts of a grand jury transcript and no challenge to the accuracy of the transcript has been made. Thus, there is no question that Barbaro actually made the statements in question. *See id.* at 358. Moreover, in light of our previous discussion of the particular circumstantial guarantees of trustworthiness contained in Barbaro's testimony, we conclude that the second requirement is satisfied as well.[20] Therefore, we reject the appellants' contention that admission of Barbaro's grand jury testimony violated their rights under the confrontation clause of the sixth amendment.

### 3. *Admission of charts into evidence*

The appellants next argue that they were denied a fair trial because the government was allowed to introduce an "overwhelming number" of enlarged charts that were merely cumulative of documentary evidence already presented to the jury. They contend that these charts were more prejudicial than probative. Thus, the charts should have been excluded under Rule 403

of the Federal Rules of Evidence.[21] Sixty-one charts showing the relationships between hundreds of separate documentary exhibits were introduced by the government. The appellants maintain that "[t]he massive quantity of the government charts unfairly emphasized the government's evidence and gave the government's theories a life of their own." Joint Br. at 27.

 This argument is without merit. We have explained that the decision to admit "summary charts is within the trial court's discretion, and will be reversed only for an abuse of that discretion." *United States v. Howard,* 774 F.2d 838, 844 (7th Cir.1985); *see also United States v. Lamp,* 779 F.2d 1088, 1094 (5th Cir.1986) (no abuse of discretion in allowing the government to use charts and summaries in complex tax evasion case), *cert. denied,* 476 U.S. 1144, 106 S.Ct. 2255, 90 L.Ed.2d 700 (1986). No abuse of discretion has been shown in this case. The district court reviewed the charts with some care, and concluded that "the charts [were] more helpful to the jury than sheets of paper." *See* Tr. at 2808. Because there were a number of separate transactions involved in the money-laundering scheme alleged in Count Two of the indictment, and scores of deposit slips and cancelled checks were submitted as documentary evidence, this was a reasonable conclusion. In addition, the court instructed the jury on the function of the charts as summaries. The court informed the jury that the charts were not themselves evi-

---

100 S.Ct. at 2543 ("The basic litmus of Sixth Amendment unavailability is established: '[A] witness is not "unavailable" for purposes of ... the exception to the confrontation requirement unless the prosecutorial authorities have made a *good-faith effort* to obtain his presence at trial.' ... The law does not require the doing of a futile act.") (quoting *Barber v. Page,* 390 U.S. 719, 724–25, 88 S.Ct. 1318, 1321–22, 20 L.Ed.2d 255 (1968)) (emphasis supplied by Supreme Court in *Roberts* ).

**19.** *See also Snyder,* 872 F.2d at 1355 (sixth amendment challenge can be overcome if proponent can show "that the testimony was given under circumstances which 'indicate that it is probably true' and which provide the jury with a sufficient basis for judging its truthfulness") (quoting *Boulahanis,* 677 F.2d at 589) (citations omitted).

**20.** *See also Guinan,* 836 F.2d at 358 ("Given our previous discussion of the guarantees of trustworthiness present in this case—in particular, the fact that the testimony was given voluntarily under oath and was substantially corroborated by other independent evidence, *see Boulahanis,* 677 F.2d at 589—we conclude that the admission of Lori Guinan's grand jury testimony did not violate the Sixth Amendment.").

**21.** Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence.
Fed.R.Evid. 403.

dence or proof of any facts and instructed them to disregard the charts if they concluded that the charts did not correctly reflect the facts shown by the evidence.[22] This instruction was consistent with our explanation in *Howard* that, when the trial court authorizes the use of charts as a teaching device rather than as substantive evidence, "the preferred practice would be for the court to give a limiting instruction regarding this purpose." 774 F.2d at 844 n. 4.[23] Thus, under the circumstances of this case, the court's decision to allow the government to introduce a number of summary charts was not an abuse of discretion.

### 4. *Refusal to strike testimony of Mary Patton Marino* [24]

■ Mary Marino testified at trial that the promotion of prostitution at the clubs was discussed and acknowledged at the management level. On December 3, 1987, during a voir dire examination before she testified as a government witness, *see* Tr. at 1492, Ms. Marino denied that she had been charged with theft in Illinois in 1980, denied any memory of the theft charges, and denied ever appearing in court with respect to the theft charges. Illinois court documents, however, confirmed that Ms. Marino had in fact been charged with theft in 1980. Ms. Marino was not questioned about these charges during her direct examination or cross-examination as a government witness. Nor was any objection to Ms. Marino's testimony made at the conclusion of her appearance as a govern-

ment witness on December 4. On December 8, however, defense counsel moved for a mistrial or, in the alternative, to strike Ms. Marino's testimony. The district court denied these motions.

On December 22, Ms. Marino again testified, this time as a witness for Mr. Pixley. In the presence of the jury, defense counsel confronted her with certified Illinois court records confirming the theft charges against her. She persisted in denying the charges and claimed not to remember appearing in court. *See* Tr. at 3621–25. After extensive examination, she ultimately conceded that the documents did say she had been indicted. She claimed, however, that the indictment "had nothing to do with [her]." Tr. at 3634.

The appellants (with the exception of Dale Doerr who expressly declined to join the other appellants' motion to strike) now argue that the district court erred in failing to strike Ms. Marino's testimony. They maintain that her "evasiveness and persistent refusal to acknowledge what was clearly the truth call into question her entire testimony." Joint Br. at 29. Because her testimony was shown to be so "inherently unreliable" that there was a substantial likelihood that it was false, the appellants contend that the district court's refusal to exclude her testimony constitutes reversible error. We disagree.

The appellants purport to rely primarily on two cases, *Manson v. Brathwaite*, 432 U.S. 98, 97 S.Ct. 2243, 53 L.Ed.2d 140

---

**22.** The court instructed the jury as follows:

The testimony of a witness and the charts or summaries prepared by him or her and admitted into evidence are received for the purpose of explaining facts disclosed by books, records and other documents which are in evidence in the case. Such charts or summaries are not in and of themselves evidence or proof of any facts. If such charts or summaries do not correctly reflect facts or figures shown by the evidence in the case, the jury should disregard them.

In other words, such charts or summaries are used only as a matter of convenience. So if and to the extent that you find that they are not in truth summaries of facts or figures shown by the evidence in the case, you are to disregard them entirely.

Tr. at 4152–53.

**23.** *See also United States v. Lewis*, 759 F.2d 1316, 1329 n. 6 (8th Cir.1985) (in order to avoid "potential for prejudice inherent in summary exhibits," instructing jury that summaries were used solely in interest of convenience and were not evidence in themselves was proper), *cert. denied*, 474 U.S. 994, 106 S.Ct. 406, 88 L.Ed.2d 357 (1986); *United States v. Kapnison*, 743 F.2d 1450, 1457–58 (10th Cir.1984) (no error in admitting charts where jury was instructed charts were not evidence, but merely summaries, and accuracy and reliability of charts were to be determined by testimony and exhibits in evidence), *cert. denied*, 471 U.S. 1015, 105 S.Ct. 2017, 85 L.Ed.2d 299 (1985).

**24.** This issue has been raised by all the appellants except Dale Doerr.

(1977), and *Neil v. Biggers*, 409 U.S. 188, 93 S.Ct. 375, 34 L.Ed.2d 401 (1972), holding that the due process clause requires the exclusion of identification evidence based on impermissibly suggestive procedures. *See* Christofalos Reply Br. at 4–5 (citing Joint Br. at 5). These precedents have little relevance to the case at hand. Unlike improperly obtained identifications, the flaws in Ms. Marino's testimony were readily apparent to the jury. By introducing the Illinois court records into evidence and confronting Ms. Marino with those records in the presence of the jury, defense counsel were given an opportunity to undermine effectively Ms. Marino's credibility. Moreover, defense counsel were able to impress upon the jury during their closing arguments that Ms. Marino's testimony had been seriously impeached. *See* Tr. at 3986–87, 4023, 4031, 4035. It is, of course, the function of the jury to make credibility resolutions, *see United States v. Vega*, 860 F.2d 779, 794 (7th Cir.1988); *United States v. Dorn*, 561 F.2d 1252, 1257 (7th Cir.1977) ("it is the function of the jury and not a reviewing court ... to judge the credibility of witnesses"); *Seifert v. Solem*, 387 F.2d 925, 928 (7th Cir.1967), and the jury in this case had sufficient evidence before it to decide for itself whether Ms. Marino was a credible witness. Under these circumstances, the district court did not err in refusing to strike Ms. Marino's testimony.

### 5. *Improper instructions on Count One*

In its jury instructions on Count One of the indictment, the district court read to the jury several Wisconsin and Illinois statutes defining a number of prostitution-related offenses. The appellants maintain that, because a prosecution under section 1952(a) does not require actual proof of a violation of state law, instructing the jurors with these statutes only served to confuse them. Such confusion allegedly arose from the fact that each statute read to the jury contains its own intent element, while the government was required to prove intent to conspire to violate section 1952. In addition, the court read to the jury a new Illinois prostitution statute that did not be-

come effective until July 1, 1984. While the conspiracy charged in Count One allegedly lasted from 1979–1987, the appellants maintain that reading this statute to the jury was error because there was no allegation in the indictment and no proof at trial that any acts of prostitution were attempted or committed in Illinois after the effective date of the new Illinois statute. We reject these objections to the jury instructions.

The standard of review applied to challenges to jury instructions is well established: " 'The question of whether a jury has been properly instructed is to be determined not upon consideration of a single paragraph, sentence, phrase or word, but upon the charge as a whole.' " *United States v. Alexander*, 743 F.2d 472, 478 (7th Cir.1984) (quoting *United States v. Lang*, 644 F.2d 1232, 1240 (7th Cir.), *cert. denied*, 454 U.S. 870, 102 S.Ct. 338, 70 L.Ed.2d 174 (1981)); *see also United States v. Bailey*, 859 F.2d 1265, 1277 (7th Cir.1988) (must view jury charge *as a whole*, rather than focusing on isolated passages), *cert. denied*, —— U.S. ——, 109 S.Ct. 796, 102 L.Ed.2d 787 (1989). So long as " 'the instructions treat the issues fairly and accurately,' " they will not be disturbed on appeal. *United States v. Thibodeaux*, 758 F.2d 199, 202 (7th Cir.1985) (quoting *United States v. Croft*, 750 F.2d 1354, 1366 (7th Cir.1984)); *see also General Leaseways, Inc. v. National Truck Leasing Ass'n*, 830 F.2d 716, 725 (7th Cir.1987) (jury instructions must be construed in a " 'common sense manner, avoiding fastidiousness, inquiring whether the correct message was conveyed to the jury reasonably well' ") (quoting *Wilk v. American Medical Ass'n*, 719 F.2d 207, 218 (7th Cir.1983), *cert. denied*, 467 U.S. 1210, 104 S.Ct. 2398, 81 L.Ed.2d 355 (1984)).

■ As the appellants correctly note, we have held that section 1952 does not incorporate state law as part of the federal offense: "[t]he federal crime is the use of the interstate facilities in furtherance of the unlawful activity, not the violation of state law." *United States v. Peskin*, 527 F.2d 71, 79 n. 3 (7th Cir.1975), *cert. denied*,

429 U.S. 818, 97 S.Ct. 63, 50 L.Ed.2d 79 (1976). Section 1952, however, *does* refer to state law in order to identify the unlawful activity in which the defendant is engaged. *Id.* (citing *United States v. Rizzo*, 418 F.2d 71, 74 (7th Cir.1969), *cert. denied*, 397 U.S. 967, 90 S.Ct. 1006, 25 L.Ed.2d 260 (1970)). Including the state statutes in the jury instructions in this case served this legitimate descriptive purpose—the statutes provided the jury with a description of the unlawful activity in which the appellants allegedly engaged. We cannot fault the district court for providing the jury with the entire range of applicable statutes. The instructions, read as a whole, permitted the jury to assess the facts accurately and comprehensively. We cannot accept the argument that mention of the 1984 Illinois statute necessarily suggested that acts of prostitution had taken place after its passage. Indeed, because of its comprehensiveness, the instruction also informed the jury precisely what was forbidden when the Illinois-based establishment was in operation.

Moreover, the likelihood of jury confusion with regard to the intent element that the government actually was required to prove appears to be quite slim. Indeed, such a possibility is pure speculation. We believe that the instructions, read as a whole, reasonably and accurately informed the jury of the intent requirement under section 1952(a) and did not mislead the jury with respect to the applicable time frames. The appellants were charged with conspiring to violate 18 U.S.C. § 1952. The jury was instructed that the government must prove that the defendant knowingly and intentionally became a member of the conspiracy. *See* Tr. at 4159. In addition, the jury received specific instructions detailing the essential elements of a section 1952 violation, including the intent element. *See* Tr. at 4164. The court also informed the jury that the definition of "unlawful activity" under section 1952 includes "any business enterprise involving prostitution *in violation of the laws of the state* in which they are committed." Tr. at 4165 (emphasis supplied). Only after giving these specific instructions did the court read the state prostitution statutes to the jury. No special attention was drawn to the intent elements of these statutes. *See* Tr. at 4171–75. Thus, the instructions accurately informed the jury of the applicable law. When the instructions are viewed in their entirety, we conclude that there is no merit in the appellants' challenge to the instructions given the jury.

### B.

### Issues Raised by Josephine Christofalos

#### 1. *Government use of "off-the-record" statements*

Before her arrest, Ms. Christofalos was interviewed by government agents on February 4, 1987. At that time, she was represented by court-appointed counsel who assured her that any statements she gave to the agents would be "off-the-record" and could not be used against her. Her attorney's advice was based on his belief that he had an agreement with the government prosecutor that her statements would be off-the-record. Ms. Christofalos moved to suppress any statements (and any "fruits" of the statements) obtained during the February 4 interview and sought dismissal of the indictment against her. At the suppression hearing, however, the prosecutor testified that no off-the-record agreement had been made. The magistrate conducting the suppression hearing found that there was no agreement between the government and Ms. Christofalos' counsel that the February 4 interview was to be off-the-record. The magistrate also found that no coercive governmental conduct, deception, or overreaching had occurred in this case. The magistrate therefore concluded that Ms. Christofalos' statements were voluntary and should not be suppressed.

The district court adopted the magistrate's findings of fact and conclusions of law and denied Ms. Christofalos' motion to suppress. On appeal, Ms. Christofalos does not challenge the district court's conclusion that her statements at the February 4 interview were voluntary. *See* Christofalos Br. at 7 ("voluntariness is not in

issue"). Neither does she challenge the district court's findings of fact. *See id.* ("Ms. Christofalos does not ask this Court to disturb those findings of historical fact."). At trial, part of the government's questioning of Ms. Christofalos stemmed from statements obtained during the February 4 interview, and Ms. Christofalos believes that some statements made during the interview were presented to the grand jury. She contends that government use of the statements violated her constitutional rights, because, at the February 4 interview, she had not knowingly and intelligently waived her fifth amendment privilege against self-incrimination. *See* Christofalos Br. at 7. Thus, she concludes that any statements obtained during the interview should have been suppressed and she should have been permitted to determine whether any statements from the interview had been presented to the grand jury.

We reject Ms. Christofalos' contention on two grounds. First, in light of the unchallenged findings of the district court, we cannot say that Ms. Christofalos' February 4 statements were obtained in violation of her fifth amendment right to be free from compelled self-incrimination. In addition, even assuming that her statements were obtained in violation of the fifth amendment, use of those statements at trial and before the grand jury did not constitute reversible error.

### a.

 The fifth amendment provides in relevant part that "[n]o person ... shall be *compelled* in any criminal case to be a witness against himself." U.S. Const. amend. V (emphasis supplied). Thus, by its own terms, the fifth amendment only protects criminal defendants from *compulsory* self-incrimination. As the Supreme Court has repeatedly explained, "the Fifth Amendment is limited to prohibiting the use of 'physical or moral compulsion' exerted on the person asserting the privilege." *Fisher v. United States,* 425 U.S. 391, 397, 96 S.Ct. 1569, 1574, 48 L.Ed.2d 39 (1976). Thus, where a defendant's incriminating statements were wholly voluntary and

were not the "product of any sort of coercion, legal or factual[,] ... it is clear that no right protected by the Fifth Amendment privilege against compulsory self-incrimination [has been] violated." *Hoffa v. United States,* 385 U.S. 293, 304, 87 S.Ct. 408, 414, 17 L.Ed.2d 374 (1966). Because the uncontested facts in this case reveal that Ms. Christofalos' presence at the February 4 interview was wholly voluntary and her statements were not the product of any coercive governmental conduct, Ms. Christofalos has failed to demonstrate any violation of her fifth amendment rights.

### b.

 i. *use of statements at trial.* Even if Ms. Christofalos' right against self-incrimination was violated, we are confident, beyond a reasonable doubt, that she suffered no prejudice at trial. Ms. Christofalos points to only one instance in this lengthy trial in which the government used any information derived from the February 4 interview. *See* Christofalos Br. at 5. On December 18, the government asked Ms. Christofalos several questions about an employee known as "Big Mouth Mike" allegedly based on information discussed during the interview. Tr. at 3133–34. No objection was made to the line of questioning at that time. Four days later, defense counsel moved that the testimony be stricken. Tr. at 3508. After characterizing the dispute as a "tempest in a teapot," Tr. at 3510, the court *granted* the motion to strike. The court noted that the challenged testimony had not "one iota of probative value." Tr. at 3511. The court also explicitly informed the jury that the "Big Mouth Mike" testimony had been stricken and instructed them to disregard any reference to "Big Mouth Mike." Tr. at 3919. We are confident that any potential constitutional violation growing out of the government's trial use of information stemming from the February 4 interview was clearly harmless beyond a reasonable doubt. *See Delaware v. Van Arsdall,* 475 U.S. 673, 681, 106 S.Ct. 1431, 1436, 89 L.Ed.2d 674 (1986); *Chapman v. California,* 386 U.S. 18, 24, 87 S.Ct. 824, 828, 17 L.Ed.2d 705 (1967).

**ii.** *presentation of statements to the grand jury.* Ms. Christofalos' claim that the district court committed reversible error by denying her motion to dismiss the indictment and refusing to allow her to explore whether any statements from the February 4 interview had been presented to the grand jury is also without merit. Even if we assume, *arguendo,* that Ms. Christofalos' right against self-incrimination was violated, the Supreme Court has explained that "[a]n indictment returned by a legally constituted and unbiased grand jury ..., if valid on its face, is enough to call for a trial on the merits." *Costello v. United States,* 350 U.S. 359, 363, 76 S.Ct. 406, 409, 100 L.Ed. 397 (1956) (footnote omitted). In *Costello,* the Court held that an indictment based entirely on incompetent evidence—hearsay—need not be quashed. *Id.* The Court's reluctance to examine the quality or sufficiency of the evidence presented to a grand jury extends even to unconstitutionally obtained evidence:

> The grand jury's sources of information are widely drawn, and the validity of an indictment is not affected by the character of the evidence considered. Thus, an indictment valid on its face is not subject to challenge on the ground that the grand jury acted on the basis of inadequate or incompetent evidence, *Costello v. United States, supra; Holt v. United States,* 218 U.S. 245 [31 S.Ct. 2, 54 L.Ed. 1021] (1910); or even on the basis of information obtained in violation

of a defendant's Fifth Amendment privilege against self-incrimination, *Lawn v. United States,* 355 U.S. 339 [78 S.Ct. 311, 2 L.Ed.2d 321] (1958).

*United States v. Calandra,* 414 U.S. 338, 344–45, 94 S.Ct. 613, 618–19, 38 L.Ed.2d 561 (1974); *see also Midland Asphalt Corp. v. United States,* —— U.S. ——, 109 S.Ct. 1494, 1499, 103 L.Ed.2d 879 (1989) ("even the grand jury's violation of the defendant's right against self-incrimination does not trigger the Grand Jury Clause's 'right not to be tried.' "); *United States v. Blue,* 384 U.S. 251, 255 & n. 3, 86 S.Ct. 1416, 1419 & n. 3, 16 L.Ed.2d 510 (1966) (even if government presented to grand jury evidence acquired in violation of the fifth amendment, "our precedents indicate this would not be a basis for abating the prosecution pending a new indictment, let alone barring it altogether") (citing *Costello* and *Lawn*); 2 W. LaFave & J. Israel, CRIMINAL PROCEDURE § 15.4(a) at 303 (1984). In light of these principles, the validity of Ms. Christofalos' indictment cannot be challenged on the basis of her suspicion that statements obtained in violation of the fifth amendment were presented to the grand jury. Thus, Ms. Christofalos' contention that the district court committed reversible error by refusing to explore the evidence presented to the grand jury must be rejected.[25]

### 2. Pre-indictment delay

Ms. Christofalos maintains that an unwarranted five-year pre-indictment delay

**25.** In *Lawn v. United States,* 355 U.S. 339, 78 S.Ct. 311, 2 L.Ed.2d 321 (1958), the Court rejected a claim similar to that raised by Ms. Christofalos. An indictment brought in 1952 against the *Lawn* petitioners was dismissed because they had been required to give testimony and produce records before the grand jury in violation of their fifth amendment privilege against self-incrimination. 355 U.S. at 345, 78 S.Ct. at 315. The petitioners were again indicted in 1953. They then moved to have a hearing to determine whether the testimony they had given and the documents they had produced before the 1952 grand jury had been used to procure the 1953 indictment. The Court, relying on *Costello,* concluded that the petitioners were not entitled to the hearing they had requested. 355 U.S. at 349–50, 78 S.Ct. at 317–18.

Ms. Christofalos also asserts that her lawyer's deficient performance at the February 4 inter-

view resulted in a denial of her sixth amendment right to the effective assistance of counsel. However, any potential prejudice stemming from this allegedly ineffective assistance was cured when the district court granted Ms. Christofalos' motion to strike the challenged "Big Mouth Mike" testimony and instructed the jury to disregard the remarks. Because she cannot demonstrate that she was prejudiced by any use made of her February 4 statements, Ms. Christofalos cannot establish that her right to the effective assistance of counsel has been impaired. *See Strickland v. Washington,* 466 U.S. 668, 687, 104 S.Ct. 2052, 2064, 80 L.Ed.2d 674 (1984) (unless defendant can show *both* deficient performance *and* prejudice to the defense, "it cannot be said that the conviction ... resulted from a breakdown in the adversary process that renders the result unreliable").

deprived her of her constitutional right to timely indictment by a grand jury and notice of the charges against her. She asserts that the delay prevented her from presenting witnesses helpful to her defense because, by the time of trial, those witnesses were either dead or could not be located. She maintains that the focus of the indictment was on events occurring between 1980 and 1982 and she asserts that she was severely prejudiced by the fact that an indictment was not returned until 1987.[26] The district court rejected this argument and refused to dismiss the indictment against Ms. Christofalos. *See* Christofalos R. 61 at 6–7; Tr. at 3511–14.

■■ Although statutes of limitation provide the "primary guarantee" against prosecutorial delay, the Supreme Court has explained that "the Due Process Clause has a limited role to play in protecting against oppressive delay." *United States v. Lovasco,* 431 U.S. 783, 789, 97 S.Ct. 2044, 2048, 52 L.Ed.2d 752 (1977). When considering whether the due process clause of the fifth amendment[27] requires the dismissal of an indictment on the ground of undue pre-indictment delay, we must engage in a two-step inquiry. First, the defendant must prove that she suffered actual and substantial prejudice. Second, the court must weigh the actual prejudice to the defendant against the government's reasons for the delay.[28]

■■ Prejudice for the purposes of this analysis is difficult to prove; the defendant must point quite specifically to how she was prejudiced, and the defendant's showing must be concrete, not speculative. "A defendant must do more than allege that a particular witness is no longer available and that the witness's testimony would have helped the defense." *United States v. Antonino,* 830 F.2d 798, 805 (7th Cir. 1987). Moreover, we shall only conclude that the death of a witness has prejudiced a defendant where we are " 'convinced that [the witness] would have testified, that his testimony would have withstood cross-examination, and that the jury would have found [him] a credible witness.' " *United States v. Valona,* 834 F.2d 1334, 1339 (7th Cir.1987) (quoting *United States v. Williams,* 738 F.2d 172, 176 (7th Cir.1984)). Further, even if we are convinced that an absent witness would have been a credible witness for the defendant, "we must still evaluate this testimony against the other trial evidence to determine if indeed its introduction would affect the trial outcome." *Id.*

■■ We cannot accept Ms. Christofalos' undue delay argument. She has failed to make the requisite showing of actual and substantial prejudice. She quite frankly admits that she has no "in-depth knowledge about what the vanished witnesses or the dead witnesses could say" and she does not state how exculpatory their testimony might be. She does not even know the

26. A grand jury did investigate the conspiracy at issue in this case in 1982, but no indictment was returned. A former FBI agent involved in the 1982 investigation in Kenosha testified that the investigation was not concluded at that time in order to safeguard another ongoing undercover investigation being conducted by the FBI—Operation Safe Bet. *See* Tr. at 257–58; Christofalos Br. at 13; *see also* note 3 *supra.*

27. "No person shall ... be deprived of life, liberty, or property, without due process of law...." U.S. Const. amend. V.

28. *See United States v. Zukowski,* 851 F.2d 174, 178–79 (7th Cir.), *cert. denied,* — U.S. —, 109 S.Ct. 174, 102 L.Ed.2d 144 (1988); *United States v. Eckhardt,* 843 F.2d 989, 994–95 (7th Cir.), *cert. denied,* — U.S. —, 109 S.Ct. 106, 102 L.Ed.2d 81 (1988); *United States v. L'Allier,* 838 F.2d 234, 238 (7th Cir.1988); *United States v. Valona,* 834 F.2d 1334, 1337–38 (7th Cir.1987);

*United States v. Wellman,* 830 F.2d 1453, 1459–60 (7th Cir.1987); *see also United States v. Chappell,* 854 F.2d 190, 195 (7th Cir.1988); *United States v. Rein,* 848 F.2d 777, 781 (7th Cir.1988) (due process violation established where government delayed "in order to gain a tactical advantage" and delay caused actual and substantial prejudice to defendant); *United States v. Fuesting,* 845 F.2d 664, 669–70 (7th Cir.1988) (same); *United States v. Antonino,* 830 F.2d 798, 804 (7th Cir.1987) (fifth amendment requires dismissal of indictment " 'if the defendant can prove that the Government's delay in bringing the indictment was a deliberate device to gain an advantage over him and that it caused him actual prejudice in presenting his defense' ") (quoting *United States v. Gouveia,* 467 U.S. 180, 192, 104 S.Ct. 2292, 2299, 81 L.Ed.2d 146 (1984)).

names of many of the witnesses that she claims would have come to her aid had the indictment been brought in 1982. *See* Christofalos Br. at 18. We do not know whether these potential witnesses would in fact have testified, whether their testimony would have withstood cross-examination, or whether the jury would have found them credible.[29] Under these circumstances, Ms. Christofalos has failed to establish prejudice.[30] *See Valona*, 834 F.2d at 1339; *Antonino*, 830 F.2d at 806. We therefore conclude that the district court did not err in refusing to dismiss the indictment because of impermissible pre-indictment delay.[31]

### 3. *Restricted admission of IRS Special Agent's Report*

In an investigation separate from that leading to the indictments in this case, the Internal Revenue Service inquired into Ms. Christofalos' failure to file federal personal income tax returns in 1981, 1982, and 1983. This investigation was discontinued in 1986. A Special Agent's Report (SAR) reviewing the investigation and recommending that it be discontinued had been prepared by the IRS special agent working on the case. On November 16, 1987, two days before trial, the district court granted Ms. Christofalos' motion for exculpatory material under *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), and ordered the government to pro-

duce any portion of the SAR pertaining to Ms. Christofalos. The government made the report available to Ms. Christofalos' counsel the next day.

On the first day of trial, November 18, the district court granted the government's motion *in limine* prohibiting Ms. Christofalos from introducing evidence of the special agent's recommendation that the investigation be discontinued. *See* Tr. at 93. The court, however, did not prohibit Ms. Christofalos from informing the jury of the fact that the investigation was discontinued or from introducing any factual material arising out of the discontinued IRS investigation. Only the agent's reasons for recommending discontinuation of the investigation were to be excluded. *See* Tr. at 93–94. Ms. Christofalos contends that the court's evidentiary ruling denied her the fundamental constitutional right to present a defense and constitutes reversible error. We disagree.

It is a well-established principle that district courts have broad discretion to assess the relevance of proffered evidence. *See United States v. Fuesting*, 845 F.2d 664, 673 (7th Cir.1988); *United States v. West*, 670 F.2d 675, 682 (7th Cir.), *cert. denied*, 457 U.S. 1139, 102 S.Ct. 2972, 73 L.Ed.2d 1359 (1982). Therefore, we shall only reverse a district court's evidentiary ruling where there has been a clear abuse of that

29. In addition, the only testimony that Ms. Christofalos has been able to describe is that of Michael Webber, who died before the indictment was brought in 1987. Ms. Christofalos asserts that Webber would have substantiated her testimony that she donated her Social Security widow's benefits to one of Mr. Doerr's churches as a legitimate tax deduction. *See, e.g.*, Tr. at 3511. This testimony could hardly have affected the outcome of the case against Ms. Christofalos, however. *See, e.g.*, Tr. at 3513–14 (district court noted that it couldn't agree with defense counsel's assertion that the absence of Webber testimony was prejudicial; "I guess I simply can't agree that there is so much hanging on the thread of the social security contributions to the church. Seems to me there is much more to the case than that.").

30. Dale Doerr and Archie Pixley adopted the portion of Ms. Christofalos' brief containing her undue pre-indictment delay argument. Their

claims must be rejected because they have provided us with no argument indicating how they were substantially prejudiced by any pre-indictment delay.

31. There is a conflict in this circuit as to whether the defendant or the government bears the burden of establishing the reason for the pre-indictment delay. *See, e.g.*, *L'Allier*, 838 F.2d at 238; *Valona*, 834 F.2d at 1338; *Wellman*, 830 F.2d at 1460 n. 10. Because Ms. Christofalos has failed to meet her burden of establishing actual and substantial prejudice, we need not resolve this conflict. We note, however, that Ms. Christofalos' improper delay argument is further weakened by the fact that the government appears to have had a legitimate reason for not seeking an indictment in 1982—bringing charges against Ms. Christofalos in 1982 could have compromised a larger undercover operation that the FBI did not wish to reveal at that time. *See supra* note 26.

wide discretion. No abuse of discretion has been demonstrated in this case. The district court concluded that the agent's recommendation was not relevant because the prosecutor, not the agent conducting the investigation, was responsible for making the final decision to terminate the investigation. *See* Tr. at 91–92. Criteria other than the merits of the investigation itself may have gone into the prosecutorial decision to terminate the investigation. *See* Tr. at 93. Moreover, the earlier IRS investigation involved Ms. Christofalos' failure to file personal income tax returns, a wholly different charge than the charge before the district court—conspiracy to impede the IRS through fraudulent business transactions. *See* Tr. at 92. In addition, the district court reasonably believed that admitting the special agent's recommendation would have led to considerable confusion. If that recommendation were admitted, the court would then be required to consider allowing the government to call other IRS agents to rebut that recommendation. Under these circumstances, the district court's decision to exclude evidence of the special agent's recommendation to discontinue the earlier IRS investigation was not an abuse of discretion.

### C.

### Issues Raised by John Paul Doerr

1. *Submission of tape transcripts to the jury*

At trial, the government presented audio tapes of conversations between an FBI undercover agent and several of the defendants. The jury was provided with transcripts of the tapes at the time the tapes were presented, and both the tapes and the transcripts were provided to the jury during its deliberations. Mr. Doerr asserts that there is an inaccuracy in one of the transcripts—the transcript incorrectly shows that he identified himself to the agent as "John Miller." Because of this alleged inaccuracy in one of the transcripts, Mr. Doerr contends that the court erred in submitting the transcripts to the jury. We disagree.

Trial courts possesses wide discretion in determining whether to allow juries to use written transcripts as aids in listening to audio tape recordings. *See United States v. Keck*, 773 F.2d 759, 766 (7th Cir.1985). In addition, we have previously held that allowing the jury to have the transcripts during their deliberations, as well as when the tapes are played during the trial, is not error. *See United States v. Puerta Restrepo*, 814 F.2d 1236, 1242 (7th Cir.1987); *United States v. Dorn*, 561 F.2d 1252, 1257 (7th Cir.1977). We cannot say that the district court abused its discretion in permitting the jury here to have the transcripts, as well as the tapes, during its deliberations. The court reasonably concluded that the transcripts would be helpful to the jury in this lengthy trial. *See* Tr. at 3898, 3916 (transcripts "would materially assist the jury here rather than making them listen to fairly long tapes"). In this case, as in *Dorn*, the "discrepanc[y] complained of [is] so minimal that [it] could not have substantially affected the meaning of the conversations." 561 F.2d at 1257. In addition, Mr. Doerr's challenge to the accuracy of the transcript was placed before the jury during defense counsel's cross-examination of the agent who had prepared the tapes. *See* Tr. at 383–89, 415–16. Finally, the district court twice instructed the jury, once before the tapes were played and again prior to their deliberations, that the tapes, not the transcripts, were evidence in this case. The jury was clearly informed that, if there was any variation between the tapes and the transcripts, they were to rely solely on the tapes. *See* Tr. at 305, 4153; *see also Puerta Restrepo*, 814 F.2d at 1241; *Dorn*, 561 F.2d at 1257 (any problems arising from alleged inaccuracies in transcripts "were obviated by the meticulous instructions given the jury concerning the proper function of the transcripts"). Under these circumstances, the district court did not abuse its discretion in allowing the jury to have the transcripts during its deliberations.

2. *Failure to prove existence and duration of conspiracy before trial*

Prior to trial, Mr. Doerr requested that the court hold a hearing, pursuant to *Unit-*

ed States v. Santiago, 582 F.2d 1128 (7th Cir.1978), to determine the admissibility of coconspirator's statements that he feared the government intended to introduce under Rule 801(d)(2)(E) of the Federal Rules of Evidence.[32] In the alternative, he requested that the court order the government to submit a written proffer of proof substantiating the existence of the conspiracy alleged in Count One of the indictment. Mr. Doerr maintains that the evidence reflects that he withdrew from the conspiracy to engage in prostitution-related activities alleged in Count One when he moved from Kenosha to California in March 1982. In his pretrial motion (and in his brief on appeal), Mr. Doerr contended that he would be unfairly prejudiced by the introduction of coconspirator statements made after his withdrawal from the conspiracy. The district court, however, rejected Mr. Doerr's request for a pretrial evidentiary hearing or written proffer of proof and, instead, adopted the methodology approved by this court in United States v. Andrus, 775 F.2d 825, 836–37 (7th Cir.1985). See J.P. Doerr R. 46 at 11–12.

■■■ The district court did not err in refusing to order a pretrial hearing to determine the existence of a conspiracy for the purposes of Rule 801(d)(2)(E). Because the evidence presented at trial might alter the court's pretrial Santiago determination, we have explained that "holding a full blown pretrial hearing for a decision which is not final is an inefficient means of resolving" the preliminary factual issues arising under the coconspirator exception. Andrus, 775 F.2d at 837. Therefore, we recognized in Andrus that procedures like those demanded by Mr. Doerr "[are] not the only acceptable means of making the Santiago determination," 775 F.2d at 837, and explicitly approved the alternate methodology utilized by the district court in this

case. A trial court "can admit the [coconspirators'] statements subject to the government's eventual proof by a preponderance of the evidence of the elements required under rule 801(d)(2)(E). If the government fails its burden, the court will either declare a mistrial or issue an appropriate limiting instruction, depending on the degree of damage done by the declarations admitted." Id.; see also United States v. Shoffner, 826 F.2d 619, 629 (7th Cir.) (order of proof on preliminary questions of fact under Rule 801(d)(2)(E) "rests within the sound discretion of the trial court"; court can require preliminary proffer of evidence or defer ruling until close of government's case), cert. denied, 484 U.S. 958, 108 S.Ct. 356, 98 L.Ed.2d 381 (1987); United States v. Peters, 791 F.2d 1270, 1285 (7th Cir.) ("The judge may admit the coconspirator hearsay conditioned upon the prosecution subsequently establishing by independent evidence the existence of a conspiracy. If the condition is never satisfied, a mistrial or at least an instruction for the jury to disregard the hearsay statements would be necessary.") (citation to Andrus omitted), cert. denied, 479 U.S. 847, 107 S.Ct. 168, 93 L.Ed.2d 106 (1986). Thus, the district court's refusal to hold a pretrial hearing on this issue was not error.

### 3. Sufficiency of the evidence/statute of limitations on Count One

Mr. Doerr asserts that the government presented insufficient evidence to support a guilty verdict with respect to him on Count One of the indictment because he withdrew from the conspiracy charge in Count One when he left Kenosha and moved to California in March 1982. He argues that the evidence presented in this case shows that he did not participate in any conspiratorial agreement or commit any acts facilitating

---

**32.** Rule 801(d)(2)(E) provides that a statement is not hearsay if it is "offered against a party and is ... a statement by a coconspirator of a party [made] during the course and in furtherance of the conspiracy." Before a coconspirator's statement is admissible under this rule, the government must establish three preliminary facts: (1) that a conspiracy existed, (2) that the defendant and the declarant were members of

the conspiracy, and (3) that the statement was made "during the course and in furtherance of the conspiracy." Each of these factual elements must be proved by a preponderance of the evidence. See Bourjaily v. United States, 483 U.S. 171, 175–76, 107 S.Ct. 2775, 2778–79, 97 L.Ed.2d 144 (1987); Garlington v. O'Leary, 879 F.2d 277, 280 (7th Cir.1989).

prostitution activities after his move to California. Because he was not indicted until April 30, 1987, Mr. Doerr contends that his withdrawal from the conspiracy in March 1982, coupled with the five-year statute of limitations applicable to the charged offense, provides him with a complete defense. Furthermore, Mr. Doerr maintains that, because the Count One prostitution conspiracy and the Count Two tax conspiracy were interrelated, and the jury was allowed to consider post–1982 acts in their deliberations with respect to him, he is entitled to a new trial on both counts of the indictment.

Mr. Doerr's contention is without merit. As we recently noted, "[a]n appellant raising a sufficiency of the evidence claim shoulders a heavy burden." *United States v. Johnston*, 876 F.2d 589, 593 (7th Cir. 1989). In our review of a sufficiency of the evidence claim, we are required to consider the evidence in the light most favorable to the government. "It is not for us to weigh the evidence or to determine the credibility of witnesses. The verdict of a jury must be sustained if there is substantial evidence, taking the view most favorable to the Government, to support it." *Glasser v. United States*, 315 U.S. 60, 80, 62 S.Ct. 457, 469, 86 L.Ed. 680 (1942). Therefore, we shall only reverse a conviction for lack of evidence when the record contains no evidence, "'regardless of how it is weighed,'" from which a rational trier of fact could find the essential elements of the crime beyond a reasonable doubt. *See*

*Johnston, supra* at 593 (quoting *United States v. Angulo*, 864 F.2d 504, 508 (7th Cir.1988)).

 We have reviewed the record in this case and conclude that the government did present sufficient evidence to support a guilty verdict on Count One. For example, the government's evidence shows that Mr. Doerr participated in the laundering of funds generated by the prostitution activities in Kenosha as late as July 6, 1982.[33] In addition, the government presented evidence showing that Mr. Doerr formed and operated his own credit card company, RH Credit Systems, which accepted payments from customers of the Kenosha club and massage parlor *after* April 30, 1982.[34] On the basis of this evidence, a rational jury could find that Mr. Doerr was participating in a conspiracy to facilitate prostitution activities even after his alleged withdrawal in March 1982.[35]

### D.

### Issues Raised By Dale Doerr

#### 1. *Sufficiency of the evidence*

 Dale Doerr argues that his conviction is not supported by sufficient evidence because the only evidence of his knowledge of the existence of the conspiracy charged in Count One came from the testimony of unindicted coconspirators. Dale also maintains that the overt acts alleged against him, which included participating in the massage parlor's bookkeeping, are consist-

---

**33.** On that date, the IRS received the tax return of the Holy Temple of Christ the Redeemer, prepared and signed by Mr. Doerr, which reported, as contributions from the public, prostitution-generated funds that had been deposited into the church account. *See* Tr. at 2100, 2517–18.

**34.** Mr. Doerr made an entry into the payment journal of RH Credit Systems as late as September 1, 1982. *See* Tr. at 3540–50. RH Credit Systems only processed payments made by customers of the Kenosha club and massage parlor. *See* Tr. at 3483.

**35.** Moreover, the jury was specifically instructed as to the requirements for withdrawal from a conspiracy. *See* Tr. at 4166–67. The accuracy of this instruction has not been challenged on

appeal. The jury apparently accepted the government's evidence of acts committed by Mr. Doerr after April 30, 1982 and concluded that he had not committed an affirmative act constituting withdrawal from the conspiracy.

Dale Doerr has adopted that portion of his father's brief challenging the sufficiency of the evidence with regard to Count One on the basis of Mr. Doerr's asserted withdrawal from the conspiracy. Dale apparently believes that he also withdrew from the conspiracy before April 30, 1982. We disagree. After April 30, 1982, Dale continued to participate in the management and operations of RH Credit Systems, an entity that existed solely to process the credit transactions of the Kenosha club and massage parlor. The jury could rationally conclude that such actions facilitated the prostitution activities at those establishments.

ent with a finding that he had no knowledge of criminal activity.

The government clearly presented sufficient evidence to support Dale Doerr's conviction. Several witnesses testified that prostitution occurred at the massage parlor, and Camille Jenkins, a masseuse at the massage parlor, identified Dale Doerr as the massage parlor's assistant manager. As Dale concedes in his reply brief, "[o]bviously, an assistant manager would know what was happening at the massage parlor." Dale Doerr Reply Br. at 3. Ms. Jenkins also testified that she received instructions from Dale regarding the manner in which she should treat customers and how she should dress. Moreover, she testified that Dale had discussed a quota system with her and told her that the masseuses had to "bring in business" and "try to make [their] quota." Tr. at 536. Another masseuse testified that Dale had given her scheduling instructions. Tr. at 1184–85. Moreover, John Patrick Doerr testified that Dale was present during conversations in which their father, John Paul Doerr, stated that the massage parlor's employees should be encouraged to have sexual relationships with "regular customers," in order to avoid being "in the back room with a cop." Tr. at 909–11. A reasonable jury could easily infer from this evidence that Dale Doerr was part of a conspiracy to facilitate prostitution.

### 2. Failure to restrict jury's consideration of Dale's premajority acts

■ Dale Doerr reached the age of 18 on August 17, 1981. He contends that the district court erred by denying his request for a jury instruction that would have precluded the jury from considering his premajority acts as evidence of acts in furtherance of the conspiracy charged in Count One of the indictment. See Tr. at 4206–08. The requested instruction would have informed the jury that premajority acts could only be considered as evidence of knowledge of the conspiracy. Id. at 4207. Dale maintains that the instruction he requested was approved by the court in United States v. Spoone, 741 F.2d 680, 687 (4th

Cir.1984), cert. denied, 469 U.S. 1162, 105 S.Ct. 917, 83 L.Ed.2d 929 (1985).

The district court did not err in refusing to give the requested instruction. Contrary to Dale Doerr's assertion, the Fourth Circuit in Spoone did not explicitly "approve" an instruction of the type he requested. Instead, the court rejected the appellant's claim that he had been convicted solely on the basis of premajority acts because "the trial court repeatedly instructed the jury that it could not consider the juvenile acts as evidence of [the appellant's] guilt." 741 F.2d at 687. Moreover, the Eleventh Circuit, in United States v. Cruz, 805 F.2d 1464, 1475–77 (11th Cir. 1986), cert. denied, 481 U.S. 1006, 107 S.Ct. 1631, 95 L.Ed.2d 204 (1987), squarely rejected any implication based on Spoone that the Federal Juvenile Delinquency Act, 18 U.S.C. §§ 5031–5042, would prohibit the conviction of a defendant on the basis of his premajority actions. The court noted that the protections of the Juvenile Delinquency Act are designed " 'to guarantee certain basic rights to juveniles who come within Federal jurisdiction.' " 805 F.2d at 1476 (quoting 120 Cong. Rec. 25,162 (statement of Sen. Bayh)). Thus the protections of the Act are not applicable to a defendant, like Dale Doerr, who is not a juvenile and has not committed an act of juvenile delinquency. See id.

■ The court also noted that "conspiracy is a continuing crime." 805 F.2d at 1475. As the courts in both Spoone and Cruz recognized, " [t]he Juvenile Delinquency Act does not ... prevent an adult criminal defendant from being tried as an adult simply because he first became embroiled in the conspiracy with which he was charged while still a minor.' " Cruz, 805 F.2d at 1475 (quoting Spoone, 741 F.2d at 687). Thus, once it is established that certain acts of the charged offense occurred after the defendant's eighteenth birthday, it is appropriate for the entire case to be tried in adult court, in accordance with adult rules of procedure and evidence. Id. at 1477. The court in Cruz therefore held that, once sufficient evidence has been introduced to allow a jury reasonably to con-

clude that a defendant's participation in a conspiracy continued after the defendant reached the age of eighteen, then the defendant may be tried as an adult. Moreover, in that adult trial, the government's introduction of evidence is to be limited only by the Federal Rules of Evidence. *Id.* at 1476. We agree.

■ In this case, sufficient evidence was introduced by the government to allow the jury reasonably to conclude that Dale Doerr had participated in the charged conspiracy after his eighteenth birthday. For example, one of the masseuses at the massage parlor testified that she saw Dale Doerr at work in the massage parlor as assistant manager almost every day that she worked over a five-month period between September 1981 and January 1982. *See* Tr. at 629–30. Dale's eighteenth birthday was in August 1981. In addition, in early 1982, Dale began participating in the operation of RH Credit Systems, the entity established by John Paul Doerr to process credit transactions at the Kenosha club and massage parlor. RH Credit Systems processed payment *only* from those two enterprises. *See supra* note 35. Thus, a reasonable jury could conclude that Dale engaged in postmajority conduct that facilitated the prostitution activity occurring at the Kenosha club and massage parlor. Because there was evidence that Dale's participation in the conspiracy continued after his eighteenth birthday, the district court did not err in refusing to give the requested limiting instruction.

3. *Untimely motion to produce handwriting exemplar*

■ Dale Doerr contends that the district court erred when it granted the government's motion requesting that he produce handwriting exemplars. This motion was filed more than two months after the deadline, already extended once, for filing pretrial motions had passed. Pursuant to the pretrial order, the last day for filing pretrial motions was July 24, 1987. The government's motion requesting a handwriting exemplar from Dale Doerr was not filed until October 5, 1987. The

government's motion was granted on October 23, 1987. *See* Dale Doerr R. 148.

Dale's contention that the court erred in granting this motion is meritless. "A trial court has discretion when considering an untimely [pretrial] motion and a reviewing court may disturb the trial court's decision only for clear error." *United States v. Hamm,* 786 F.2d 804, 806 (7th Cir.1986). No clear error has been demonstrated here. The government has a legitimate reason for its untimely request—it maintains that it did not learn until late September 1987 that Dale intended to contest his authorship of various RH Credit Systems documents. *See* Dale Doerr R. 13 at 2; Government Br. at 63. Moreover, the court granted the government's motion nearly one month before the trial was scheduled to begin, and Dale has not made any concrete showing that he was prejudiced by the order requiring him to produce the handwriting exemplar. Under these circumstances, we cannot say that the district court clearly erred in granting the government's untimely request.

4. *"Youthful" jurors*

Over Dale Doerr's objection, the district court refused to adjourn the trial to allow two ill jurors, characterized by Dale as "youthful," to recover. Instead, the district court excused the ill jurors and replaced them with alternates. Dale maintains that the court abused its discretion by failing to interrogate the jurors with regard to the seriousness of their illnesses before dismissing them. He also contends that dismissing the two jurors without any factfinding prejudiced him because both jurors were approximately the same age that he was.

■ Rule 24(c) of the Federal Rules of Criminal Procedure allows the district judge to replace with alternates any jurors who "become or are found to be unable or disqualified to perform their duties." The decision to remove a juror under this rule "is committed to the sound discretion of the trial judge, and there is no abuse of discretion if the record shows some legitimate basis for his decision." *United*

*States v. Peters,* 617 F.2d 503, 505 (7th Cir.1980) (citations omitted). In addition, where the nature of the juror's inability to continue is evident to the court, a hearing on the issue is unnecessary. *Green v. Zant,* 715 F.2d 551, 555 (11th Cir.1983) (failure to hold a hearing before dismissing a juror *when the jury had already begun deliberating* was abuse of discretion because it appeared as though the juror's refusal to impose the death penalty might have been a factor in her dismissal). Moreover, "some showing of prejudice is ordinarily necessary before a conviction will be overturned on this ground." *Peters,* 617 F.2d at 505.

We reject Dale Doerr's contention that the district court's dismissal of the two jurors constitutes reversible error. Because legitimate reasons for the court's decisions to excuse the jurors are evident, no abuse of discretion has been demonstrated. The district court consulted with a nurse before dismissing the first juror, *see* Tr. at 2540, 2542–43, and the second juror informed the court that he was "very very ill." *See* Tr. at 3502. Under these circumstances, the jurors' inability to continue was clearly evident to the court. Moreover, adjourning the trial while awaiting the recovery of these jurors would have unnecessarily delayed the completion of an already lengthy trial. Perhaps more importantly, Dale has not made any showing that he was prejudiced by the court's action. He merely asserts that the dismissed jurors were the same age as he was and, thus, may have "identif[ied] more with his case." *See, e.g.,* Tr. at 2544, 3504. He has not in any way explained why youthful jurors might have been any more sympathetic to him. Such speculation hardly constitutes a demonstration of prejudice warranting reversal of a conviction. *See also* Tr. at 3505 (district court noted that it was "not aware of anything that guarantees to any defendant any particular type of juror"). The district court's decision to excuse the jurors

and replace them with alternates thus was not an abuse of discretion.

## E.

### Issues Raised by the Pixleys

Christa Pixley and her husband Archie both moved that their trials be severed from those of the other defendants in this case. The Pixleys assert that, because the indictment lists a large number of overt acts attributable to their codefendants in which they themselves did not participate, the possibility of the guilt of the other defendants "spilling over" onto them was great. They maintain that the mass of evidence, the number of defendants and issues involved, and the complexity of the case made it difficult for the jury to keep separate the evidence relating to each defendant. The Pixleys maintain that the district court's denial of their severance motions constituted an abuse of discretion. We do not agree.

Rule 14 of the Federal Rules of Criminal Procedure authorizes the district court to grant a severance where it appears that a defendant is prejudiced by the joinder of offenses or defendants for trial.[36] The standards governing our review of a district court's decision to deny a severance motion are well established and "most difficult" to satisfy. *United States v. Moya–Gomez,* 860 F.2d 706, 754 (7th Cir.1988), *cert. denied,* —— U.S. ——, 109 S.Ct. 3221, 106 L.Ed.2d 571 (1989). As we explained in *Moya–Gomez:*

> A district court's ruling on a Rule 14 severance motion will be overturned only upon a showing of abuse of discretion. Because the balancing of the cost of conducting separate trials and the possible prejudice inherent in a single trial is best conducted by the trial court, the defendant bears an extremely difficult burden of showing on appeal that the district court abused its discretion. In order to

---

**36.** Rule 14 provides in part that:

> If it appears that a defendant or the government is prejudiced by a joinder of offenses or of defendants in an indictment or information or by such joinder for trial together, the

court may order an election or separate trials of counts, grant a severance of defendants or provide whatever other relief justice requires. . . .

Fed.R.Crim.P. 14.

appeal successfully the denial of a severance motion, a defendant must establish actual prejudice resulting from the denial. Actual prejudice means that the defendant could not have a fair trial without severance, " 'not merely that a separate trial would offer him a better chance of acquittal.' "

860 F.2d at 754 (quoting *United States v. Peters*, 791 F.2d 1270, 1301 (7th Cir.) (quoting *United States v. Papia*, 560 F.2d 827, 836 (7th Cir.1977)) (citations omitted), *cert. denied*, 479 U.S. 847, 107 S.Ct. 168, 93 L.Ed.2d 106 (1986)); *see also United States v. Diaz*, 876 F.2d 1344, 1357 (7th Cir.1989).

We do not believe that the Pixleys have met their burden under this demanding standard. While we have recognized that denial of a severance motion may constitute an abuse of discretion when there is a great disparity of evidence between the moving defendant and his codefendants, *see, e.g., Moya–Gomez*, 860 F.2d at 765 (citing *Peters*, 791 F.2d at 1302), the mere existence of such a disparity " 'is not itself grounds for a severance.' " *Diaz, supra,* at 1357 (quoting *United States v. Hendrix*, 752 F.2d 1226, 1232 (7th Cir.), *cert. denied*, 471 U.S. 1021, 105 S.Ct. 2032, 85 L.Ed.2d 314 (1985)). Instead, "the relevant inquiry is whether it is within the jury's capacity to follow the trial court's limiting instructions requiring separate consideration for each defendant and the evidence admitted against him." *Moya–Gomez*, 860 F.2d at 765, *quoted in Diaz, supra,* at 1358.

In this case, the district court twice informed the jury, once at the beginning of the trial and then again before the jury began its deliberations, *see* Tr. at 39–40, 4155, that separate consideration must be given to each defendant and each count of the indictment. The following instruction was given to the jury before it began deliberating:

[A]lthough the defendants are being tried jointly, you must give separate consideration to each defendant. In doing

so, you must analyze what the evidence in the case shows with respect to each defendant, leaving out of consideration any evidence admitted solely against some other defendant or defendants. Each defendant is entitled to have his case decided on the evidence and law applicable to him or her.

Tr. at 4155. In addition, when explaining the elements of the conspiracy charge to the jury, the court instructed the jury that, "[i]n determining whether the defendant became a member of the conspiracy, you may consider only the acts and statements of that particular defendant." Tr. at 4160. In *Diaz*, identical limiting instructions recently were held sufficient in themselves to protect the defendants from any prejudice resulting from a joint trial. *See Diaz, supra,* at 1358. In this case as well, in light of the significant public benefits attendant to the joint trial of multiple defendants allegedly involved in a single conspiracy, the instructions given by the district court adequately protected the defendants from prejudice. The Pixleys have made no showing of prejudice aside from raising the spectre of "spill over" guilt. Because we must presume that jurors are capable of following the court's limiting instructions and sorting through the evidence for each defendant separately, such speculation does not constitute the demonstration of actual prejudice required to challenge successfully a district court's denial of a severance motion. *See id.* (" 'To say that the jury might have been confused amounts to nothing more than an unfounded speculation that the jurors disregarded clear instructions of the court in arriving at their verdict. Our theory of trial relies upon the ability of a jury to follow instructions.' ") (quoting *Opper v. United States*, 348 U.S. 84, 95, 75 S.Ct. 158, 165, 99 L.Ed. 101 (1954)). We cannot say that the Pixleys' trial was unfair. Thus, denial of their motions to sever was not an abuse of discretion.[37]

---

[37]. Mr. Pixley, contending that Counts One and Two of the indictment were improperly joined for trial, also moved that those counts be severed. *See* Archie Pixley Br. at 4. He has, however, presented us with no argument demonstrating how the district court's denial of his severance motion caused him any actual prejudice. Moreover, the offenses charged in Counts One and Two of the indictment were essentially part of a common scheme, were based upon

## Conclusion

For the preceding reasons, we affirm the convictions of Dale Doerr, John Paul Doerr, Josephine Christofalos, Christa Pixley, and Archie Pixley.

AFFIRMED.

many of the same acts and transactions, and much of the government's evidence on these counts overlapped. Thus, it does not appear that joinder of the two offenses in one indictment was inappropriate under Rule 8(a) of the Federal Rules of Criminal Procedure. "Two or more offenses may be charged in the same indictment ... if the offenses charged ... are based on the same act or transaction or on two or more acts or transactions connected together or constituting parts of a common scheme or plan." Fed.R.Crim.P. 8(a). Mr. Pixley has made no showing that the district court's denial of his motion to sever in this case was an abuse of discretion.